IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No.  14-12696-CC

_____

ETERNAL WORD TELEVISION
NETWORK, INC.,

Plaintiff-Appellant,

STATE OF ALABAMA,

Plaintiff,

versus

SECRETARY, U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

Before: PRYOR, MARTIN, and JORDAN, Circuit Judges.

BY THE COURT:

In light of the Supreme Court's decision today in *Burwell v. Secretary of Health and Human Services,* ___ S.Ct. ___, 2014 WL 2921709 (U.S. June 30,

2014), we grant the motion of Eternal Word Television Network for an injunction pending appeal, and deny as moot the request for expedited briefing and oral argument.    The Secretary is enjoined from enforcing against EWTN the substantive requirements set forth in 42 U.S.C. § 300gg-13(a)(4) and from assessing fines or taking other enforcement action against EWTN for non-compliance.

We express no views on the ultimate merits of EWTN's appeal in this case.

**MOTION FOR INJUNCTION PENDING APPEAL GRANTED; MOTION FOR EXPEDITED BRIEFING AND EXPEDITED ORAL ARGUMENT DENIED AS MOOT.**

PRYOR, Circuit Judge, specially concurring:

I concur that we should grant the injunction pending appeal sought by The Eternal Word Television Network, Inc. I write separately to explain why the Network is substantially likely to succeed on the merits of its appeal that the contraception mandate of the Patient Protection and Affordable Care Act, 42 U.S.C. § 300gg-13(a)(4), violates the Religious Freedom Restoration Act, *id.* § 2000bb-1. The Network has asserted, without dispute, that it "is prohibited by its religion from signing, submitting, or facilitating the transfer of the government-required certification" necessary to opt out of the mandate. The Network further asserts that, by requiring it to deliver Form 700 to the third-party administrator of its health insurance plan, the United States has forced the Network "to forego religious precepts" and instead, contrary to Catholic teachings, materially cooperate in evil. *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004). If it fails to deliver that form, the Network faces $12,775,000 in penalties a year. 26 U.S.C. § 4980D(b)(1). If that is not a substantial burden on the free exercise of religion, then it is hard to imagine what would be.

The argument of the United States calls to mind the proverbial Mizaru, Kikazaru, and Iwazaru who cover their eyes, ears, and mouth to see, hear, and speak no evil. That is, the United States turns a blind eye to the undisputed evidence that delivering Form 700 would violate the Network's religious beliefs.

3

The United States instead pretends that the Network's complaint fails because the Network holds an erroneous legal opinion about how the contraception mandate works. But make no mistake: the Network offers no evidence that its complaint turns on the advice of counsel. The Network bases its complaint on the undisputed declarations of a Catholic theologian and the Network's chief executive about ancient teachings of the Catholic Church. The Network complains that it would violate those teachings and commit a grave sin if it were to comply with the mandate. That belief is undisputed.

It is neither our duty nor the duty of the United States to tell the Network that its undisputed belief is flawed. *See Burwell v. Hobby Lobby Stores, Inc.*, No. 13-354, slip op. at 36–37 (U.S. June 30, 2014). The Supreme Court has instructed that "it is not for us to say that the line [drawn by the religious believer] was an unreasonable one. Courts should not undertake to dissect religious beliefs. . . ." *Thomas v. Rev. Bd. of the Ind. Emp't Sec. Div.*, 450 U.S. 707, 714, 101 S. Ct. 1425, 1430 (1981). The United States flouts that instruction by treating an undisputed religious belief as a disputed question of law. But "it is not for us to say that [the Network's] religious beliefs are mistaken or insubstantial." *Hobby Lobby*, No. 13-354, slip op. at 37. We must instead "determine whether the line drawn [by the Network] reflects an honest conviction, and there is no dispute that it does." *Id.* at 37–38 (internal quotation marks and citation omitted).

4

## I. BACKGROUND

In 1981, a cloistered nun of the Poor Clares of Perpetual Adoration order founded the Eternal Word Television Network in Irondale, Alabama. The Network is a nonprofit corporation that now employs 350 full-time employees and is the largest Catholic media network in the world. The Network is not formally affiliated with the Roman Catholic Church or any diocese, but its mission is to serve the Church and broadcast its teachings. It transmits Catholic programming every hour of the day in many languages to more than 230 million homes in 144 countries and territories. The Network also broadcasts worldwide two 24-hour radio services, which can be heard on shortwave radio, satellite radio, and on the Internet. It airs family and religious programing, airs daily Masses and prayers, and provides spiritual devotions. It prints and distributes a newsletter featuring Catholic teaching. The Network also has a chapel on its campus, which holds a daily Mass open to the public. Its campus also includes an outdoor shrine, Stations of the Cross, private prayer areas, and religious statutes, images, and icons.

The Network refuses to provide, subsidize, or support health insurance that in any way encourages the use of artificial contraception, sterilization, or abortion, all of which it considers "grave sin." The Network believes, in accordance with Catholic doctrine, that human sexuality has two primary purposes that cannot be separated: to unite husband and wife and for the generation of new lives. The

5

Network actively professes Catholic doctrine, as articulated by Pope Paul VI, that abortion, even for therapeutic reasons, is "absolutely excluded as lawful means of regulating the number of children." *Humanae Vitae* ¶ 14. And "[e]qually to be condemned . . . is direct sterilization, whether of the man or of the woman, whether permanent or temporary." *Id.* Finally, "[s]imilarly excluded is any action which either before, at the moment of, or after sexual intercourse is specifically intended to prevent procreation—whether as an end or as a means." *Id.* Catholic doctrine teaches that it is "serious error" to justify sexual intercourse "which is deliberately contraceptive and so intrinsically wrong." *Id.* The Network also invokes the teachings of Pope John Paul II, who declared that it is "morally unacceptable to encourage, let alone impose, the use of methods such as contraception, sterilization and abortion in order to regulate births." *Evangelium Vitae* ¶ 91. Based on these teachings, the Network considers contraception, sterilization, and abortion "grave sin."

The Network is eligible for a religious accommodation from the contraception mandate of the Affordable Care Act, which requires employers to provide employees with insurance coverage for contraception recommended by the Health Resources and Services Administration, including all contraceptive methods approved by the Food and Drug Administration. 45 C.F.R. § 147.130(a)(1)(iv); 29 C.F.R. § 2590.715-2713(a)(1)(iv); 26 C.F.R. § 54.9815-

6

2713(a)(1)(iv). The law exempts religious employers from that mandate. 45 C.F.R. § 147.131(a). But the Network does not qualify as a religious employer. *See* 26 U.S.C. § 6033(a)(3)(A)(i), (iii). It instead may certify that it is religiously opposed to providing contraceptive services and may seek a religious accommodation. 45 C.F.R. § 147.131(b); 29 C.F.R. § 2590.715-2713A(a); 26 C.F.R. § 54.9815-2713A(a). That accommodation allows an "eligible organization" to opt out of contracting, arranging, paying for, or referring for contraceptive coverage to which it has religious objections. *Coverage of Certain Preventative Services Under the Affordable Care Act*, 78 Fed. Reg. 39,870-01, 39,879 (July 2, 2013). An "eligible organization" is a nonprofit organization that holds itself out as a religious organization and opposes providing some or all contraceptive coverage on account of religious objections. *Id.* The organization must self-certify that it objects to the contraceptive coverage by signing Form 700. *Id.* When an eligible organization with a self-insured plan, like the Network, signs Form 700, that form is "treated as a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA." *Id.* The form notifies the administrator of its obligation to provide contraceptives to the eligible organization's employees and beneficiaries. 29 C.F.R. § 2590.715-2713A(b)(1)(ii)(B); 26 C.F.R. § 54.9815-2713A(b)(1)(ii)(B). The administrator notifies the employees and beneficiaries that it, in lieu of the eligible organization,

7

will provide contraceptive coverage. 29 C.F.R. § 2590.715-2713A(d). And the administrator may seek reimbursement for payments for contraceptive services from the United States. *Id.* § 2590.715-2713A(b)(3). Because the regulations provide that Form 700 is one of the "instruments under which the [health insurance] plan is operated," that form gives the third-party administrator legal authority to become the plan administrator for purposes of contraceptive coverage. 78 Fed. Reg. at 39,880.

The Network specifically objects to Form 700, which it must sign and deliver to opt out of the mandate. The form states that the Network "certif[ies] that, on account of religious objections, [it] opposes providing coverage for some or all of any contraceptive services that would otherwise be required to be covered." EBSA Form 700—Certification, Dep't of Labor, http://www.dol.gov/ebsa/ preventiveserviceseligibleorganizationcertificationform.doc (all Internet materials as visited June 30, 2014, and available in Clerk of Court's case file). But the form also states that the Network "must provide" a copy of the form to the third-party administrator of its health insurance plan "in order for the plan to be accommodated with respect to the contraceptive coverage requirement." *Id.* The form states that the delivery of the form to the third-party administrator constitutes notice that the administrator should undertake its obligations to provide contraception to the Network employees. *Id.*; *see also* 26 C.F.R. § 54.9815-2713A

8

(administrator must separately pay for any contraceptive services for employees); 29 C.F.R. § 2590.715-2713A (same); *id.* § 2510.3-16 (administrator shall be treated as a designation of the administrator as the plan administrator responsible for coverage of contraception). To comply with the mandate, the Network must deliver the form to its administrator before July 1, 2014. If the Network fails to comply, federal law subjects it to a fine of $12,775,000 per year. 26 U.S.C. § 4980D(b)(1).

The Network objects to filing Form 700 for at least four reasons. First, the Network contends that, by filing the form, the Network "trigger[s]" the third-party administrator's obligation to make separate payments for contraceptive services for the Network's employees and beneficiaries. Second, the Network contends that it will have to identify its employees to the third-party administrator so that the administrator may notify those employees that it will provide contraceptive coverage, and the Network will have to coordinate with the administrator when employees and beneficiaries need to be removed or added to the healthcare plan. *But see* 78 Fed. Reg. at 39,885 (failing to specify whether the employer or the health insurance issuer must update the list of eligible insurees). Third, the Network states that, in the event the third-party administrator also objects to providing contraceptive coverage, 26 C.F.R. § 54.9815-2713A(b)(2); 29 C.F.R. § 2590.715-2713A(b)(2), the Network will have to find another third-party

9

administrator willing to comply with the mandate so that the Network can take advantage of the accommodation. Fourth, the Network objects to the regulation that bars it from telling any third-party administrator to disregard the instructions on the form or influencing the administrator's decision to provide contraceptive coverage. *See* 26 C.F.R. § 54.9815-2713A(b)(1)(iii); 29 C.F.R. § 2590.715-2713A(b)(1)(iii). The Network concludes that, by executing the form and participating in the accommodation scheme, the Network "would ensure that its health insurance plan would serve as the trigger for a stream of payments to its employees for the specific purpose of increasing access to, and use of, contraceptive, sterilization, and abortifacient services." It refuses to designate its third-party administrator as its agent to provide contraceptive coverage because the Network believes that designation "is precisely the same as directly providing those services." The Network states that its participation in the scheme contradicts its public witness to Catholic beliefs.

The Network likens its dilemma to a recent controversy in Germany. In the late 1990s, Germany allowed abortions within the first 12 weeks of pregnancy for health-related reasons if the pregnant woman received state-mandated counseling. Representatives from Catholic churches in Germany agreed to act as counselors. After counseling, a church had to issue a certificate stating that the pregnant woman had received counseling. If the pregnant woman rejected the church's

10

counsel not to have an abortion, she could present the certificate issued by the church and obtain an abortion. According to a declaration filed by the Network in the district court, the German bishops were divided about whether the Catholic churches were cooperating with evil by issuing the certificates, so they asked the Vatican about whether the churches' counseling could be justified. Pope John Paul II wrote to the bishops that the certification issued by the churches was a necessary condition for abortion without punishment and, as a result, the practice had to cease.

Likewise, the Network attests that if a religious nonprofit employer complies with the accommodation provision of the mandate, the employer will be guilty of immoral cooperation with evil. By signing the form, the employer declares that it objects to contraception, but "actually becomes the agent that enables a host of immoral actions to follow." That complicity in the mandate "could not be justified or excused by the Principle of Material Cooperation in Evil" and is "an immoral act."

Based on these objections to the mandate, the Network, joined by the State of Alabama, filed a complaint against the U.S. Departments of Health and Human Services, Labor, and Treasury, and their respective Secretaries. The Network alleged that the mandate violated the Religious Freedom Restoration Act, the First Amendment, the Fifth Amendment, and the Administrative Procedure Act. The

Network submitted a declaration of its Chief Executive Officer, Michael Warsaw, and a declaration of a Catholic theologian, John Haas. From these declarations, the Network distilled suggested determinations of undisputed fact, which stated that it was "prohibited by its religion from signing, submitting, or facilitating the transfer of the government-required [Form 700]." The United States did not object to the Network's description of its religious beliefs and objected only to the extent that the Network offered an interpretation of what the regulations required.

The district court ruled that the mandate did not violate the Religious Freedom Restoration Act or the First Amendment. The district court then denied the Network's motion for a preliminary injunction pending appeal, but other district courts in our Circuit have granted injunctions in similar appeals. *See Roman Catholic Archdiocese of Atlanta v. Sebelius*, No. 1:12-cv-03489-WSD, 2014 WL 1256373 (N.D. Ga. March 26, 2014); *see also Beckwith Electric Co., Inc. v. Sebelius*, 960 F. Supp. 2d 1328 (M.D. Fla. 2013). The Network now seeks an emergency motion for an injunction pending appeal in this Court.

## II. STANDARD OF REVIEW

We will grant an injunction pending appeal if the appellant establishes a substantial likelihood that it will prevail on the merits of the appeal, a substantial risk of irreparable injury unless the injunction is granted, the threatened injury to the appellants exceeds whatever damage an injunction may cause the appellees,

12

and any injunction would not disserve the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

## III. DISCUSSION

I divide my discussion in three parts. First, I explain why the Network is substantially likely to prevail on the merits of its claim that the mandate violates the Religious Freedom Restoration Act. Second, I conclude that there is a substantial risk of irreparable injury if we were to deny the injunction. Third, I conclude that no substantial harm to the United States or to the public interest would result if we were to grant the injunction.

### A. The Network Is Substantially Likely To Prevail on the Merits of Its Appeal.

The Religious Freedom Restoration Act states that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). But the Act excepts government-imposed burdens on religion if the application of that burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(b). The Act requires that we first address whether the United States has substantially burdened the Network's exercise of religion and then consider whether the burden is the least restrictive means of furthering any compelling governmental interest.

13

The Network has established a substantial likelihood that the mandate violates the Act.

### 1. There Is a Substantial Likelihood that the Mandate Substantially Burdens the Religious Practices of the Network.

The parties contest whether Form 700 substantially burdens the religious practices of the Network. Let me be clear: The Network does not claim to be burdened by the existence of federal regulations inapplicable to the Network that require contraceptive coverage for women in the United States. Instead, the Network objects that the mandate coerces it to participate in an activity prohibited by its religion.

The Network argues that the mandate requires its participation in the contraceptive delivery system by forcing the Network to execute and deliver Form 700 to the third-party administrator of its health insurance plan. The Network states that its belief that it is religiously prohibited from signing and delivering that form is sincere and undisputed and the district court erred by failing to accept that belief. The Network concludes that its role as a participant in the mandate scheme substantially burdens its religious exercise.

The United States describes the Network's position in a different way. It contends that the Network does not object to informing its third-party administrator of its decision not to provide contraceptive coverage, but instead objects to the requirements imposed on the third-party administrator. The United States rejects

14

the Network's claim that the form "triggers" contraceptive coverage. It argues that the provision of contraceptive coverage by a third-party administrator occurs "*despite* [the Network's] religious objections, not *because* of them." In other words, federal law, not Form 700, compels the provision of contraceptive coverage by a third-party administrator.

Religion is "substantially burdened" if a regulation "requires participation in an activity prohibited by religion." *Midrash Sephardi*, 366 F.3d at 1227. A "substantial burden" is "more than an inconvenience on religious exercise." *Id.* It is "akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." *Id.* It "tends to force adherents to forego religious precepts." *Id.*

The decision of the Supreme Court in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526 (1972), illustrates this concept. In *Yoder*, the Supreme Court ruled that a law requiring school attendance beyond the eighth grade substantially burdened the religious practices of the Amish. 406 U.S. at 214–19, 92 S. Ct. at 1532–35. The Supreme Court stated that the record "abundantly support[ed]" the claim that the traditional way of life of the Amish—including nonconformity—was "not merely a matter of personal preference, but one of deep religious conviction." *Id.* at 216, 92 S. Ct. at 1533. The Supreme Court concluded that "unchallenged testimony of acknowledged experts in education and religious history, almost 300 years of

15

consistent practice, and strong evidence of a sustained faith pervading and regulating [the Yoder's] entire mode of life support[ed] the claim that enforcement of the State's requirement of compulsory formal education after the eighth grade would gravely endanger if not destroy the free exercise of [the Yoder's] religious beliefs." *Id.* at 219, 92 S. Ct. at 1535.

And the decision of the Supreme Court in *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 101 S. Ct. 1425, is an even closer analogue to the issue in this appeal. *See Hobby Lobby*, No. 13-354, slip op. at 37 (applying *Thomas* to decide that the mandate substantially burdened the religious exercise of closely held corporations). In *Thomas*, an employer transferred his employee, a Jehovah's Witness, from fabricating sheet steel at a roll foundry to fabricating turrets for military tanks. *Id.* at 710, 101 S. Ct. at 1428. The employee objected to the new job duties on the religious ground that those duties involved the manufacture of weapons. All other available jobs were also weapons-related, so the employee quit and applied for unemployment compensation benefits. *Id.* The Indiana Supreme Court ruled that the employee had made merely a "personal philosophical choice rather than a religious choice" by quitting. *Id.* at 714, 101 S. Ct. at 1430. After all, he had earlier fabricated steel, which also could have been used for the production of military tanks. *Id.* But the Supreme Court rejected the second-guessing of the Indiana high court: "[The employee's]

16

statements reveal no more than that he found work in the roll foundry sufficiently insulated from producing weapons of war. We see, therefore, that [the employee] drew a line, and it is not for us to say that the line he drew was an unreasonable one. Courts should not undertake to dissect religious beliefs . . . ." *Id.*

Our precedents too are instructive. In *Midrash Sephardi*, we ruled that a zoning requirement did not "substantially burden" religion. 366 F.3d at 1228. The zoning requirement would require congregants to walk farther to attend synagogue, but "we [could not] say that walking a few extra blocks [was] 'substantial.'" *Id.* In so ruling, we emphasized that the congregants offered no argument that the current location of their synagogue had some religious significance such that their faith required a synagogue at that particular site. *Id.* Likewise, in *Cheffer v. Reno*, 55 F.3d 1517 (11th Cir. 1995), we confronted a claim that a federal law prohibiting violent, threatening, obstructive, or destructive conduct at abortion clinics substantially burdened religious practices. The plaintiffs in *Cheffer* had a sincerely held religious belief that abortion was murder, but they failed to "assert that the exercise of their religion require[d] them to use physical force or threats of physical force to prevent abortions" or "that the exercise of their religion require[d] them to physically obstruct clinic entrances." *Id.* at 1522. As a result, we concluded that the law itself did not "substantially burden" the religious practices of the plaintiffs. *Id.* But in *Knight v. Thompson*, 723 F.3d 1275 (11th Cir. 2013), we ruled

17

that a prison policy substantially burdened the religious exercise of Native American inmates. *Id.* at 1283. The prison policy required inmates to wear a "regular haircut" and prohibited long hair. *Id.* at 1277. The inmates stated that long hair was a central tenant of their religious faith. *Id.* We agreed with the inmates that the policy substantially burdened their religion because the evidence was uncontroverted that "long hair has great religious significance for many Native Americans" and that requiring the inmates to cut their hair would amount to an "assault on their sacredness." *Id.* at 1283. We stated that "[t]he sincerity of these firmly-held beliefs—and the gravity of preventing their exercise—should come as no surprise to anyone familiar with Biblical Scripture." *Id.* But we nevertheless upheld the policy as the least restrictive means to ensure the compelling government interest of prison safety. *Id.* at 1287.

The D.C. Circuit recently explained that the beliefs at stake in this appeal—Catholic teachings on contraception—are "unchallengeable." *Gilardi v. U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208, 1216 (D.C. Cir. 2013). The question in this appeal is instead whether the mandate "requires participation in an activity prohibited" by those Catholic teachings. *Midrash Sephardi*, 366 F.3d at 1227. And Catholic teaching about that issue is undisputed in this record.

The United States refused to contest the religious beliefs of the Network averred in evidence presented to the district court. The United States does not

18

dispute the Network's belief that its Catholic faith prohibits it from signing, submitting, or facilitating the transfer of the form. The United States does not dispute the Network's belief that "[p]articipating in the 'accommodation' would do nothing to lessen [its] complicity in what it believes to be a grave moral wrong." And the United States does not dispute that were the Network to facilitate access to contraception, sterilization, or abortifacients, the Network would violate its religious beliefs, betray its identity, and contradict its public teaching.

Indeed, these religious beliefs of the Network are unchallengeable. As the declarations submitted to the district court make clear, contraception, sterilization, and abortion have long been condemned by the Catholic Church. And any encouragement of contraception, sterilization, and abortion is "morally unacceptable." *Evangelium Vitae* ¶ 91.

As applied to the mandate, the Network believes that its complicity in the scheme is condemned by the principle of material cooperation in evil. The Network sincerely believes that any complicity would constitute "an immoral act." Accordingly, the Network believes that providing Form 700 to its third-party administrator would be a sin.

Instead of disputing these long-held religious tenets of the Catholic Church, the United States disputes the Network's interpretation of what the regulations require. But the Network's legal interpretation is beside the point. What matters is

19

whether the Network's participation in the contraception scheme—however minimal—violates its religious beliefs. And the record offers no dispute about that fact. Because those beliefs are undisputed, it is not our role to second guess this "difficult and important question of religion and moral philosophy, namely, the circumstances under which it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of an immoral act by another." *Hobby Lobby*, No. 13-354, slip op. at 36.

I part ways with the Sixth and Seventh Circuits, which have denied injunctions in similar appeals, because the decisions of those courts are wholly unpersuasive. *See Mich. Catholic Conference & Catholic Family Servs. v. Burwell*, Nos. 13-2723, 13-6640, 2014 WL 2596753 (6th Cir. June 11, 2014); *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014). Both courts decided that the mandate imposes an independent obligation on the third-party administrator and that independent obligation does not constitute a substantial burden on the plaintiffs' exercise of religion. *Mich. Catholic Conference*, 2014 WL 2596753, at *10; *Univ. of Notre Dame*, 743 F.3d at 552 ("[The University] has no right to prevent other institutions, whether the government or a health insurance company, from engaging in acts that merely offend the institution."). Form 700, those courts held, does not "trigger" contraceptive coverage.

20

Rubbish. Even if the form alone does not "trigger" coverage—whatever that means—it is undeniable that the United States has compelled the Network to participate in the mandate scheme by requiring the Network not only to sign but also to deliver the form to its third-party administrator of its health insurance plan. The Network must sign a form that, on its face, states that the Network's delivery of it is required "in order for the plan to be accommodated with respect to the contraceptive coverage requirement." EBSA Form 700—Certification, Dep't of Labor, http://www.dol.gov/ebsa/preventiveserviceseligibleorganization certificationform.doc (all Internet materials as visited June 30, 2014, and available in Clerk of Court's case file). And why *must* the Network provide Form 700 to its administrator? Because without the form, the administrator has no legal authority to step into the shoes of the Network and provide contraceptive coverage to the employees and beneficiaries of the Network. 78 Fed. Reg. at 39,879–80 ("[A] plan administrator is defined in ERISA section 3(16)(A)(i) as 'the person specifically so designated by the terms of the instrument under which the plan is operated' . . . . [T]he self-certification is one of the instruments under which the employer's plan is operated. . . . The self-certification . . . will be treated as a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA.").

21

Form 700 is "more than an inconvenience on religious exercise" because it "requires *participation* in an activity prohibited by religion." *Midrash Sephardi*, 366 F.3d at 1227 (emphasis added). To be sure, federal law requires contraceptive coverage whether or not the Network signs the form. But the problem in this appeal is that federal law compels the Network to *act*. That participation, the Network has declared, without dispute, makes it complicit in a grave moral wrong according to the teachings of the Catholic Church. Unlike the plaintiffs in *Cheffer*, who could not say that the exercise of their religion required them to use physical force to prevent abortion, 55 F.3d at 1522, the Network has declared that its religion requires it to abstain from signing and delivering Form 700—a form that states it will be used to effectuate the mandate. And much like the evidence of religious practice in *Yoder* and *Knight*, that religious belief is undisputed. Form 700 "directly coerces the [Network] to conform [its] behavior" to materially cooperate with evil according to Catholic teaching. *Midrash Sephardi*, 366 F.3d at 1227. So long as the Network's belief is sincerely held and undisputed—as it is here—we have no choice but to decide that compelling the participation of the Network is a substantial burden on its religious exercise. *See Hobby Lobby*, No. 13-354, slip op. at 35–38 ("Arrogating the authority to provide a binding national answer to this religious and philosophical question, [the agency and the dissenters] in effect tell the plaintiffs that their beliefs are flawed. For good reason, we have

22

repeatedly refused to take such a step." (internal citation omitted)); *Thomas*, 450 U.S. at 715, 101 S. Ct. at 1430 ("Thomas drew a line, and it is not for us to say that the line he drew was an unreasonable one."); *Univ. of Notre Dame*, 743 F.3d at 566 (Flaum, J., dissenting) ("[W]e are judges, not moral philosophers or theologians; this is not a question of legal causation but of religious faith."). The form is likely a substantial burden.

### 2. There Is a Substantial Likelihood that the Mandate Is Not the Least Restrictive Means to Address Any Compelling Governmental Interest.

Because the mandate imposes a substantial burden on the Network, the United States must establish that a compelling governmental interest justifies the burden and that the burden is the least restrictive means of achieving that interest. 42 U.S.C. § 2000bb-1(b); *see United States v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429, 126 S. Ct. 1211, 1219 (2006). The United States must establish a compelling interest in not exempting the specifically burdened party. *Id.* at 430–31, 126 S. Ct. at 1220. The Supreme Court has made clear that "mere invocation of the general characteristics" of a generally applicable law "cannot carry the day." *Id.* at 432, 126 S. Ct. at 1221. Instead, the United States must establish how exempting nonprofit organizations that hold themselves out as Catholic adversely affects its interest in providing contraceptive coverage for all. *See, e.g.*, *Yoder*, 406 U.S. at 236, 92 S. Ct. at 1543 (clarifying that the state

23

had to establish how its admittedly strong interest in education "would be adversely affected by granting an exemption *to the Amish*" (emphasis added)).

The United States asserts that the coverage provision advances two compelling interests: promoting public health and assuring that women have equal access to health care services. The United States cites evidence that contraception use reduces health risks posed by unintended pregnancies, avoids risks of adverse pregnancy outcomes by improving birth spacing, and can prevent certain cancers, menstrual disorders, and pelvic pain. The United States also contends that, if the Network's claims were successful, the Network would subvert the ability of the United States to accommodate religious concerns. The United States reasons that objectors must have a way of notifying the United States that they object to the mandate so that the United States can accommodate the objection. And the Network's legal theory, if successful, would require the United States to restructure the entire accommodation regime. *But see Hobby Lobby*, No. 13-354, slip op. at 43 ("[B]oth RFRA and its sister statute, RLUIPA, may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs.").

But the United States fails to establish that its interest in public health or equal access to health care services would be adversely affected by granting an exception to the Network and organizations like it. *But see Yoder*, 406 U.S. at 216,

24

92 S. Ct. at 1543 (clarifying that the government must establish that its compelling governmental interest would be adversely affected by excepting the objecting party). Nor can it. The United States has already exempted thousands of religious organizations from the mandate. 45 C.F.R. § 147.131(a). And any argument that the Network, if successful, might subvert the ability of the United States to accommodate religious concerns is circular. The United States has altogether failed to accommodate religious objections if that "accommodation," as it is currently structured, constitutes a substantial burden on religion.

Even if we assume, for the sake of argument as the Supreme Court did in *Hobby Lobby*, that the mandate serves a compelling governmental interest, the accommodation provision is not the least restrictive means to address that compelling governmental interest. In *Hobby Lobby*, the Supreme Court expressly refused to decide whether the accommodation provision satisfies strict scrutiny. *Hobby Lobby*, No. 13-354, slip op. at 43–44 & 44 n.40 (declining to answer a question not before the Court). That question is before us in this appeal, and the United States has failed to satisfy that test. The United States, for example, could require the Network to provide a written notification of its religious objection to the Department of Health and Human Services, instead of requiring the Network to submit Form 700—an instrument under which the health insurance plan is operated—to the third-party administrator. *See Hobby Lobby*, No. 13-354, slip op.

25

at 10 n.9 (acknowledging that the Supreme Court recently permitted a nonprofit to opt out of the mandate in this manner in *Little Sisters of the Poor v. Sebelius*, 571 U.S. ___,134 S. Ct. 1022 (2014)). It is substantially likely that the United States fails to establish that the accommodation provision, as currently structured, is the least restrictive means to address any compelling governmental interest, the "most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534, 117 S. Ct. 2157, 2171 (1997).

*B. The Network Has Established a Substantial Risk of Irreparable Injury.*

The Network argues that, without an injunction, it will suffer irreparable harm because it will be required either to participate in the mandate scheme in contravention of its religious beliefs or to violate the law and pay ruinous fines. The Network equates this harm with the loss of First Amendment freedoms, which constitutes irreparable injury. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271–72 (11th Cir. 2006). The United States does not respond to the Network's assertions of irreparable harm.

Even though the Religious Freedom Restoration Act created a statutory rule, it is a response to the decision of the Supreme Court about the Free Exercise Clause of the First Amendment. *O Centro*, 546 U.S. at 424, 126 S. Ct. at 1216. The statutory promise the Act embodies is necessarily intertwined with the constitutional promise of the Free Exercise Clause. *See Korte v. Sebelius*, 735 F.3d

26

654, 666 (7th Cir. 2013) ("Although the claim is statutory, RFRA protects First Amendment free-exercise rights."). And the loss of First Amendment freedoms, even if temporary, "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976).

The discussion by the United States of the injunction granted in *Little Sisters of the Poor, Home for the Aged v. Sebelius*, 571 U.S. ___, 134 S. Ct. 1022 (2014), illustrates the irreparable harm likely to result if we deny the Network's motion. We cannot interpret that order as a statement about the merits of this appeal, but the issuance of that injunction further confirms that this appeal warrants an injunction. That order was "based on all of the circumstances of the case," *id.*, which the United States argues are distinct from the circumstances of this appeal. In *Little Sisters*, the nonprofit employer's plan was exempt from ERISA, so the third-party administrator was *not* required to assume responsibility for contraceptive coverage. And the third-party administrator in *Little Sisters* had affirmed that it would not voluntarily provide payments for contraception services. The United States asks us to distinguish *Little Sisters* because the injunction entered in that appeal did not alter whether the employees would receive coverage. Whether an injunction issued or not, the employees would not receive contraceptive coverage. But here, the Network's plan is not exempt from ERISA, so the law requires the third-party administrator to provide contraceptive coverage.

The United States argues that, unlike *Little Sisters*, the employees and beneficiaries will receive contraceptive coverage if we do not grant the injunction. But if we enter the injunction, the employees and beneficiaries will not receive contraceptive coverage.

Though raised by the United States, this distinction between the effect of an injunction in *Little Sisters* and the effect of an injunction in this appeal does not favor the United States. Unlike in *Little Sisters*, a refusal to enter an injunction in this appeal results in the provision of contraceptive coverage to the Network's employees. The Network will suffer irreparable harm without the injunction: the Network will be subject to fines or will be required to and deliver Form 700 to its third-party administrator, an act it alleges constitutes material cooperation with evil. The Network has satisfied its burden that irreparable injury is likely to result in the absence of an injunction.

### C. No Harm Will Result to the Appellees or to the Public.

The Network contends that the United States has failed to articulate that it will suffer harm if we issue an injunction. The Network further argues that the public interest weighs in favor of granting the injunction because there is a strong public interest in the free exercise of religion even where that interest may conflict with another statutory scheme.

28

The balance of harms between the Network and the United States weighs in favor of the Network, which has established that it is likely to suffer irreparable injury without an injunction. The United States is silent as to any harm it will suffer if we issue an injunction.

Issuing an injunction will not harm the public interest. The United States argues in passing that an injunction might harm the public interest because it "would deprive hundreds of employees and their families of medical coverage." But this argument fails much like the argument that the mandate constitutes a compelling government interest likely fails. The employees at the Network have never been provided contraception. An injunction would maintain the status quo. Moreover, the United States has exempted thousands of religious employers from the mandate, and the United States has grandfathered countless other plans. 78 Fed. Reg. at 39,887 n.49 (describing grandfathered plans). In the light of these exemptions and delays to the mandate, it cannot be that one more delay pending appeal will harm the public interest.

For the foregoing reasons, I concur in the decision to grant an injunction pending appeal.