The SCHOOL OF THE OZARKS, INC., d/b/a College of the Ozarks, Plaintiff,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., Defendants.

Case No. 13–03157–CV–S–BP.

United States District Court, W.D. Missouri, Southern Division.

Signed Jan. 13, 2015.

Ashley Lowe Norgard, Ginger K. Gooch, Virginia L. Fry, Husch Blackwell LLP, Springfield, MO, Joann T. Sandifer, Husch Blackwell LLP, St. Louis, MO, for Plaintiff.

Jacek Pruski, U.S. Department of Justice, Washington, DC, for Defendants.

**ORDER**

BETH PHILLIPS, District Judge.

This matter comes before the Court on Plaintiff's Motion for Summary Judgment, (Doc. 31); Defendants' Motion to Dismiss, or Alternatively Motion for Summary Judgment, (Doc. 35); and American Civil Liberties Union's and American Civil Liberties Union of Missouri's (collectively "ACLU") Motion for Leave to File *Amici Curiae* Brief, (Doc. 38). For the following reasons, Defendants' Motion is **GRANTED**, Plaintiff's Motion and the ACLU's Motion are **DENIED**.

## I. Background [1]

### A. Parties

Plaintiff is the School of the Ozarks, Inc. ("School"), a "four year liberal arts coeducational college located in Lookout, Missouri." (Doc. 32, p. 8.) The School has a "five-fold emphasis" which focuses on academic, vocational, Christian, patriotic, and cultural education to develop students' character. (*See id.*) Further, the School was originally established by a Missouri charter granted to the Missouri Synod of the Presbyterian Church. The School became a not-for-profit corporation pursuant to Missouri law in 2003. Currently, the School has more than 270 full-time employees and contracts to provide a group health insurance plan through an insurance company.

Defendants are the government agencies which administer the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 300gg–13(a)(4), namely the Department of Health and Human Services ("HHS"), the Department of Treasury and

---

1. The Court has considered the parties' statements of material facts supported by evidence and drawn all inferences in favor of the nonmovant. *Heacker v. Safeco Ins. Co. of Am.*, 676 F.3d 724, 726 (8th Cir.2012). Included in this section are facts that the Court concludes are uncontroverted and supported by the evidentiary record. The parties have agreed the relevant facts are undisputed and the case may be decided through summary judgment.

the Department of Labor ("Labor"), as well as the secretary for each agency, (collectively "Departments").

### B. ACA and Contraceptive Mandate

Under the ACA, an employer with more than 50 full-time employees must provide qualifying health insurance coverage to its employees. If such an employer does not provide health insurance coverage, it may be liable for assessable payments under 26 U.S.C. § 4980H(a) if one or more of its employees qualifies for a premium tax credit on the Health Insurance Marketplace.

One issue the ACA sought to address was the underutilization of preventative services due largely to the costs associated with such preventative services. As a part of the law's overall goal of encouraging preventative care, the ACA requires coverage of certain preventative services to women without cost-sharing, including co-payments, coinsurance, or deductibles. With respect to contraception coverage, HHS requested the Institute of Medicine ("IOM") conduct research to determine which preventative services should be required.

The research indicated that negative health consequences for the mother and child may occur in cases when a pregnancy is unintended. Further, unintended pregnancy can result in delayed prenatal care, continuation of behaviors which create risks for the fetus, as well as depression and anxiety. Contraceptives also help space pregnancies, which avoids the risk associated with closely-spaced pregnancies. In addition, contraceptives may be used by women for whom pregnancy is contraindicated and to treat or prevent other conditions, such as menstrual disorders, acne, and certain cancers. Further, the research indicated women in reproductive years spend 68 percent more on out-of-pocket health care costs than men.

The Health Resources and Services Administration ("HRSA") guidelines for preventative care and screening were created based upon the recommendations from the IOM. The guidelines require all FDA-approved contraceptives be covered, as well as patient education and counseling regarding those contraceptives, for women. This portion of the guidelines has been referred to as the Contraceptive Mandate ("Mandate").

The Mandate applies to all non-grandfathered plans offered either by employers or on the Health Insurance Marketplace, except "religious employers." The religious employer generally applies to houses of worship. Specifically a religious employer "is one that: (1)[h]as the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the Code." Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed.Reg. 39,870, 39,873–74; 45 C.F.R. § 147.131(a).

The School is considered a religious nonprofit under the ACA. Religious nonprofits may receive an accommodation as an eligible organization. In order to qualify, an eligible organization must: (1) have a religious objection to some or all contraceptive services required; (2) be a nonprofit entity; (3) hold itself out as a religious organization; and (4) self-certify the above either through EBSA Form 700 ("Form 700") sent to the insurance provider or third-party administrator ("TPA") or a written notice to HHS.[2] After notification of the

---

2. Originally, an eligible organization was required to self-certify by sending Form 700 to its insurer or TPA. The form contains language which informs the insurer or TPA that it must provide contraceptive coverage. A

accommodation, either through Form 700 or notification from the Departments, the insurance provider segregates contraceptive coverage from the eligible organization's plan. The organization cannot be required "to contract, arrange, pay[, directly or indirectly], or refer for contraceptive coverage" to which it has objected. Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 39,870, 39,874. Further, the insurance provider must send out separate notifications to the covered employees informing them of the accommodation and that "the eligible organization does not administer or fund contraceptive benefits[.]" 45 C.F.R. § 147.131(d).

### C. The School's Religious Objection

The School believes human life begins at the fusion of the two haploid gametes which creates a zygote, or fertilized egg. Further, the school believes the destruction of a fertilized egg is morally wrong based upon its religious beliefs and convictions. The School objects to the emergency contraceptive drugs ulipristal acetate ("*ella*") and levonorgestrel ("Plan B"),[3] as well as any counseling or education regarding those drugs, because they may interrupt implantation of the fertilized egg. For these reasons, the School has specifically excluded coverage for objectionable contraceptives in its group health insurance plans in the past. Moreover, the School initiated a lawsuit against its insurance company when it discovered its group health insurance plan provided such coverage. The Departments do not dispute the School's sincere religious belief. The School qualifies as an eligible organization and may utilize either accommodation method.

## II. Analysis

### A. Summary Judgment Standard[4]

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Substantive law identifies which facts are material. *Id.* When ruling on a motion for summary judgment, the Court should view the facts in the light most favorable to the adverse party and allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *Reed v. ULS Corp.*, 178 F.3d 988, 990 (8th Cir.1999). A moving party is "entitled to judgment as a matter of law" if the nonmoving party fails to demonstrate an essential element of a claim for which it has the burden of proof. *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990).

### B. RFRA Claim

■ The Religious Freedom Reformation Act ("RFRA") provides that any law which substantially burdens a person's free exercise of religion must be (1) in furtherance of a compelling government interest and (2) use the least restrictive means of

---

second method for self-certification was added in August 2014. As an alternative to Form 700, an eligible organization may submit the relevant information in writing to HHS. The Departments then confer with the insurer or TPA to ensure separate coverage for the organization's employees.

**3.** Ulipristal acetate is also known as *ella* or the "week-after-pill" and levonorgestrel is also known as Plan B, Plan B One–Step, Next Choice and the "morning-after-pill." The School's briefing mentioned opposition to intrauterine devices, but during oral arguments, the School indicated its opposition 'is only to these two drugs.

**4.** Because the Court has considered the facts on the record, the Court has considered the Department's motion as one for summary judgment.

furthering that interest. 42 U.S.C. § 2000bb–1(b). To establish a claim, a plaintiff must first show the law in question substantially burdens the plaintiff's sincere religious exercise. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 428, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006).[5] If the plaintiff can make such a showing, the burden then shifts to the government to show the law uses the least restrictive means to further a compelling government interest. *Id.* The parties agree that the School sincerely believes participating in the accommodation process violates its religious beliefs. However, the parties do not agree about the burden created by the accommodation process. Therefore, the initial question is whether the School has shown the accommodation creates a substantial burden upon its sincere religious exercise.

### i. Substantial Burden

■ In support of its argument that the Mandate constitutes a substantial burden on its sincere religious exercise, the School argues that the Mandate requires the school to actively participate in a scheme forbidden by its religious beliefs. The School explains that forcing it to participate in the accommodation process results in the School facilitating the provision of religiously offensive contraceptives to its employees. The Departments respond that the action taken by the School to opt out is the same action it took before the Mandate was enacted when notifying its insurer to not provide contraceptive coverage to its employee. Therefore the Mandate does not force the School to modify

its behavior and, by extension, cannot be considered a substantial burden. In the event the accommodation process does constitute a modification of the School's previous action, the Departments argue that the action is too attenuated to the religious belief to constitute a substantial burden. The School replies that because it honestly believes the accommodation process violates its religious beliefs, the Court cannot question the claim and must conclude that it substantially burdens the School's religious beliefs.

First, the Court finds it does not have to accept the School's characterization of its honest beliefs as constituting a substantial burden. As discussed in *Priests for Life,* the School's argument essentially requires the Court to "accept [its] understanding of the obligations the regulations impose" and equates any analysis of the substantial nature of the burden with impermissibly evaluating the sincerity of its beliefs. *Priests for Life v. U.S. Dep't of Health & Human Servs.,* 772 F.3d 229, 248–49 (D.C.Cir.2014). However, allowing no evaluation of the nature of the burden would read "substantial" out of the statute and "collapse[ ] the distinction between sincerely held belief and substantial burden." *Id.* at 249.

Further, the arguments made by the School invoke a misreading or misunderstanding of the accommodation's impact on contraceptive coverage. The accommodation does not trigger or provide a conduit to coverage by another party because the insurance provider's obligation already existed under the Mandate. *Univ. of Notre*

5. RFRA was enacted by Congress to reinstate the compelling interest test used in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). This was in response to the Supreme Court decision in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108

L.Ed.2d 876 (1990), where the Court held the strict scrutiny standard would no longer apply to neutral laws of general applicability under the Free Exercise Clause of the First Amendment. Therefore, pre-*Smith* cases applying strict scrutiny are instructive in evaluating RFRA claims.

*Dame v. Sebelius,* 743 F.3d 547, 554–55 (7th Cir.2014). The insurer must provide contraceptive coverage. *Id.* at 555. The accommodation simply notifies either the insurer or the government that the eligible organization will take no part in providing coverage and will have no further involvement with contracting, arranging, paying, or referring for such coverage. The obligation to provide contraceptive coverage is then between the government and a third party. "And burdens that fall only on third parties not before the court do not substantially burden plaintiff[s]." *Priests for Life,* 772 F.3d at 248.

The Court also disagrees with the School's contention that the consequence cannot be separated from the action. After the School notifies either the insurer or the government that it will take no part in providing contraceptive coverage, the coverage provided is completely segregated from the School's policy. The provider cannot directly or indirectly require the School to pay or arrange for the coverage in any way. Once an accommodation is requested, all actions and costs relating to the coverage of those contraceptives are handled separately by the insurance provider and pursuant to federal law. The employees are notified by the insurance provider that the employer has utilized the accommodation and will not be providing the objectionable coverage. While the School may disagree with the ultimate outcome that the insurance company provides its employees contraceptive coverage, the actions taken by the government and the insurance provider cannot form the basis of the School's RFRA claim. *See Mich. Catholic Conference & Catholic Family Servs. v. Burwell,* 755 F.3d 372, 388 (6th Cir.2014); *Bowen v. Roy,* 476 U.S. 693, 699, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986).

Further, the majority of Circuits that have reviewed challenges to the accommodation have rejected the School's analysis.

*Mich. Catholic Conference,* 755 F.3d at 388 (in affirming the denial of preliminary injunctions the court found "[t]he government's imposition of an independent obligation on a third party does not impose a substantial burden on the appellants' exercise of religion."); *Univ. of Notre Dame,* 743 F.3d at 554 (rejecting both the "triggering" and "conduit" arguments as the basis for a substantial burden and affirming the denial of preliminary relief); *Priests for Life,* 772 F.3d at 252–54 (rejecting the "triggering" and "conduit" arguments because they are based upon a misunderstanding of the challenged law.)

In addition, many of the previous cases challenging the accommodation and relied upon by the School were decided before the regulations permitted the School to opt out by informing HHS instead of using Form 700. The holding of many such cases relied in large part on the language of Form 700 and concluded it worked to designate the provider as an agent to provide contraceptive coverage. *See e.g. Eternal Word Television Network, Inc. v. Sec'y, U.S. Dept. of Health & Human Servs.,* 756 F.3d 1339, 1343, 1347 (11th Cir.2014) (Pryor, J., concurring) (emphasizing the role Form 700 has in transferring the "legal authority to step into the shoes of the [organization]" to the insurance provider or TPA). However, the School is no longer required to use Form 700 to obtain an accommodation and can instead provide notice of its objection to HHS. Upon receipt of the notice, HHS or Labor contact the provider or TPA to arrange for coverage of the employees as required by the Mandate. The second accommodation method makes it clear that the Mandate itself creates the obligation, not any action taken by the eligible organization. The insurance providers, regardless of the type of employer who obtains coverage, must provide contraceptive coverage pursuant to the Mandate. The ac-

commodation works only to prevent the eligible organization from having to contract, arrange, pay, or refer for contraceptive coverage. This further demonstrates that the accommodation process requires essentially the same action by the School as it has taken previously to exclude objectionable contraceptive coverage. For these reasons, the School cannot establish a violation of the RFRA because it cannot establish a substantial burden to its free exercise of religion.

### ii. Compelling Government Interest

▇ Alternatively, even if the Court found the accommodation substantially burdens the School's free exercise of religion, the Court finds the Departments have established the Mandate uses the least restrictive means to further a compelling government interest. To establish a compelling government interest, the government must demonstrate an interest beyond broadly framed justifications. *Burwell v. Hobby Lobby Stores, Inc.*, —— U.S. ——, 134 S.Ct. 2751, 2779, 189 L.Ed.2d 675 (2014). Instead, "the Government [must] demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* (citation and internal marks omitted).

The parties dispute what evidence may be used to establish the compelling interest in this case. The Departments contend that evidence supporting the entire Mandate should be evaluated because the interests that prompted and justify it are broader than the School's objection. Further, the research that supports the Mandate did not break down the various services drug-by-drug or method-by-method because it was not compiled with such a challenge in mind and therefore did not make the specific distinctions which the School contends are necessary. The School asserts only evidence regarding *ella* and Plan B may be used by the Departments to establish the compelling interest because those are the only types of contraceptives to which it has an objection. Because it argues no specific evidence was compiled regarding *ella* and Plan B, the Departments cannot establish a compelling interest.

In the absence of case law to support the School's position, the Court is not persuaded that the Departments should be prevented from using the more generalized research which provided the basis for the Mandate. However, the Court agrees it must review the compelling interest as it relates to the School's specific objection. *See id.* If there is no compelling interest to require the School to comply with the accommodation process, then the Departments have failed to meet their burden. Therefore, while the Court will not limit its review of the compelling interest to evidence specifically related only to *ella* and Plan B, it will consider such evidence in the light of the School's objection to the two drugs.

The Departments assert the government has a compelling interest in providing contraceptives to promote the health of women and children, as well as advancing equality in health care coverage for women. The Departments rely on the IOM report, "Clinical Preventive Services for Women: Closing the Gaps" ("IOM Report"), which provided the basis for the Mandate and emphasized the importance of providing unhindered, cost-free contraceptive coverage. *See* 78 Fed.Reg. at 39,872; Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps*, 109–10, (2011).[6] According to the report, women with unintended pregnancies may

---

6. The full report is available for download at http://www.iom.edu/Reports/2011/Clinical– Preventive–Services–for–WomenClosing–the– Gaps.aspx

delay prenatal care or continue risky behaviors which impact both the mother and the child. Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps,* 103, (2011). The consequences of unintended pregnancies on both women and children make the availability of reliable methods of family planning an important part of health care coverage for women in their reproductive years. *Id.* at 109. Beyond preventing the negative consequences of unintended pregnancy, the research indicated the use of contraceptives to space pregnancies to avoid complications, to avoid pregnancy in women for whom pregnancy is contraindicated, and to treat and prevent other conditions, such as menstrual disorders, acne, and certain cancers, all led to the recommendation to include contraceptives in the preventative care provided to women without cost-sharing. *Id.* at 103–07.

In addition to the impact on health, contraceptive coverage has an economic impact on women as well. Women pay significantly more for preventative care during their reproductive years. Further, studies indicate it actually costs "15 to 17 percent more not to provide contraceptive coverage in employee health plans than to provide such coverage" when medical costs and indirect costs of pregnancy are considered. 78 Fed.Reg. at 39,872. "An unintended pregnancy is virtually certain to impose substantial, unplanned-for expenses and time demands on any family, and those demands fall disproportionately on women." *Priests for Life,* 772 F.3d at 263. The Supreme Court has long recognized that "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives." *Planned Parenthood of Se. Penn. v. Casey,* 505 U.S. 833, 856, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Further, Congress has also noted the economic consequences which can occur in the workplace when women become pregnant through both the Pregnancy Discrimination Act, 42 U.S.C. § 2000e *et seq.* and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* Promoting women's equal participation in the economy has long been a compelling interest and the Mandate furthers that goal by making contraceptives not only available, but also affordable. *See Priests for Life,* 772 F.3d at 263 (finding the government had established "overlapping and mutually reinforcing compelling interests in promoting public health and gender equality.")

The School argues the compelling interest is undermined by the fact that the Mandate has multiple exceptions. The Court disagrees because the School has overstated the breadth of the exceptions. Although small employers are not required to provide health insurance coverage, small employers who voluntarily provide health plans are subject to the Mandate, as are individual policies purchased through the health care exchanges. Such inclusion means that far more women are provided coverage as required by the Mandate than just those employed by large employers. Further, religious employers are exempted from the Mandate, but the rationale for that exception makes it unlikely to have much impact upon the women the Mandate seeks to protect. Unlike eligible organizations that do not necessarily employ people of their own faith or beliefs, religious employers have the same religious beliefs as their employees. *See Priests for Life,* 772 F.3d at 266. Therefore, if the religious employer objects to contraception, the employee likely has the same objection. Such an objection makes use of contraceptives by those women unlikely, regardless of the coverage provided. In addition, the exemption for grandfathered plans merely provides a "transitional measure and will be eliminated as employers make changes to their health care plans." *Id.* (quoting

45 C.F.R. § 147.140(g)). Therefore, the exceptions provided are not so broad that they undermine the compelling nature of the interest.

As to the School's specific objection to *ella* and Plan B, the Court agrees with the Departments that the full range of FDA-approved contraceptives must be included in order to provide the most flexibility for women and their doctors in choosing a method which is appropriate based upon a woman's individual needs. Moreover, the government has a compelling interested in ensuring women have access to all options to prevent unintended pregnancy, not just those that prevent fertilization of an egg. In light of the Government's compelling interest in avoiding administrative, financial and/or logistical burdens on women seeking all types of contraception, the Court sees no reason why the School's challenge to two drugs should change the compelling nature of the government's interest in this case. For these reasons, the Departments have demonstrated compelling interests that support the Mandate and the application of the accommodation to the School.

### iii. Least Restrictive Means

■ To determine whether the accommodation is the least restrictive means of furthering the governments compelling interest, the Court considers whether there is "a less drastic way of satisfying its legitimate interests." *Anderson v. Celebrezze*, 460 U.S. 780, 806, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (internal quotations omitted). However, the School's suggested alternatives all place additional burdens upon women and prevent unhindered, cost-free access to contraceptives. Alternatives such as tax credits, reimbursements, expansion of federal programs, or incentives to drug companies to provide free contraceptives may be less restrictive, but would not serve the government's interest because it makes obtaining contraceptives

more onerous. *See Priests for Life*, 772 F.3d at 265 ("evidence shows that contraceptive use is highly vulnerable to even seemingly minor obstacles."). In addition, while allowing an exemption for eligible organizations would also be less restrictive, it would result in a gap in coverage for those employees and would undermine the compelling interest the government has established. As discussed above, the accommodation process requires very little from the School while maintaining contraceptive coverage which the Departments have established plays an important role in women's health and equality. For those reasons, the Court finds the Departments have established the Mandate uses the least restrictive means to further the government's compelling interest and summary judgment in favor of the Departments is appropriate on Count I of the Amended Complaint.

### C. Violation of the Free Exercise Clause

■ "A Free Exercise Clause challenge, in contrast to a claim under RFRA, receives strict scrutiny only if the challenged law is either not neutral or not generally applicable." *Priests for Life*, 772 F.3d at 267 (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993)). "Neutrality and general applicability are interrelated[.]" *Lukumi*, 508 U.S. at 531, 113 S.Ct. 2217. A law is not neutral if it "refers to a religious practice without a secular meaning" or if "the object of a law is to infringe upon or restrict" religiously motivated practices. *Id.* at 533, 113 S.Ct. 2217. Further, a law is not generally applicable if it selectively burdens "conduct motivated by religious belief." *Id.* at 543, 113 S.Ct. 2217.

■ Here, the School makes two arguments that the Mandate is not neutral or

generally applicable. Although the majority of courts evaluating the Mandate have found it to be neutral and generally applicable, *See, e.g., Mich. Catholic Conf.,* 755 F.3d at 394; *Priests for Life,* 772 F.3d at 267–69, the Court will also review the School's position. First, the School argues that exempting the houses of worship while requiring other religious organizations to utilize the accommodation procedure shows it is not neutral and generally applicable because it preferences specific religious entities. However, the legislative history of the ACA indicates the Mandate was not enacted for any religious purpose and does not target any religion. *See Conestoga Wood Specialties Corp. v. Sebelius,* 917 F.Supp.2d 394, 410 (E.D.Pa.2013) (finding the history supports the regulation's goal is to promote public health and gender equality and not to target religion) (reversed on other grounds). Further, the text of the ACA establishes that it does not selectively target specific religion and applies generally. *See Priests for Life,* 772 F.3d at 268 (finding the law neutral and generally applicable because it is "not selectively targeting religious conduct, whether facially or intentionally, and broadly appl[ies] across religious and non-religious groups alike."). Therefore, the court concludes exempting houses of worship is not based upon any discriminatory intention and is neutral as to the type of religion practiced.

Further, the school contends the exemption of small businesses shows favor to secular objectors over religious objectors to the Mandate and demonstrates a lack of neutrality and general applicability. However, small employers are not obligated to provide *any* health insurance coverage to their employees. The threshold of 50 employees is a neutral tool to select large employers who are required to provide health insurance coverage or face potential penalties. Further, small businesses that voluntarily provide insurance coverage are subject to the Mandate. In addition, employees without coverage through their employer may receive coverage through the health care exchanges, which are also subject to the Mandate. Therefore, the exemption for small businesses is not based on any discriminatory intention and is neutral as to the type of religion practiced.

Further, the law anticipates religious objections and provides exceptions and accommodations. These exceptions and accommodations indicate there is no preference for secular objections, such as economic considerations, over religious objections in enforcing the Mandate. *Priests for Life,* 772 F.3d at 268–69. In addition, it establishes the law does not burden only religiously motivated conduct in that it attempts to impose no burden at all on such conduct. *See Lukumi,* 508 U.S. at 543, 113 S.Ct. 2217. Because there is no basis for determining the law is not neutral or generally applicable, the School cannot establish a violation of the Free Exercise Clause and summary judgment in favor of the Departments is appropriate on Count II of the Amended Complaint.

## D. Violation of the Establishment Clause

 The Establishment Clause prohibits the government from preferring one religious denomination over another. *Larson v. Valente,* 456 U.S. 228, 246, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). A law which aids or prefers one religion over others is subject to strict scrutiny. *Id.* Much like its argument regarding the Free Exercise Clause, the School argues the law essentially prefers houses of worship over other religious organizations. However, the difference, as explained above, is based on the structure and purpose of the organizations and how that impacts the type of

employees they may hire. It does not pass any value judgment upon the various organizations. "[R]eligious employers, defined as in the cited regulation, have long enjoyed advantages (notably tax advantages) over other entities . . . without these advantages being thought to violate the establishment clause." *Univ. of Notre Dame*, 743 F.3d at 560 (citing *Walz v. Tax Commission of City of New York*, 397 U.S. 664, 666, 672–73, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)). Further, while "the exemption does differentiate between types of religious organizations based on their structure and purpose[,] . . . the Establishment Clause does not prohibit the government from making such distinctions when granting religious accommodations as long as the distinction drawn by the regulations between exempt and non-exempt entities is not based on religious affiliation." *Grote Indus., LLC v. Sebelius*, 914 F.Supp.2d 943, 954 (S.D.Ind.2012) (citation omitted).

The School also argues that use of the tax code definitions outside the tax context creates impermissible and excessive entanglements between religion and the government. However, this argument is based upon non-binding guidelines which have not been applied to them, and therefore cannot be challenged at this point. *See Mada–Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir.1987). Further, there is no factual basis for determining that these factors will be used in determining which entities are exempt from the Mandate, as there is no question that the School is not a "religious employer" in this case. Moreover, this argument was consistently rejected in other courts. *See Priests for Life*, 772 F.3d at 272–75 (finding the excessive entanglement argument based upon the IRS guidelines was not ripe as it was not impermissibly applied to any plaintiffs); *Mich. Catholic Conference*, 755 F.3d at 395–96 (finding no factual basis to determine the government will need to make any determination as to which entities are

exempt; therefore no excessive entanglement has been shown); *Univ. of Notre Dame*, 743 F.3d at 560 (holding the distinction is based upon the tax code and there is no factual basis for finding government entanglement in identifying "religious employers"). For these reasons, the School has not established a violation of the Establishment Clause and summary judgment in favor of the Departments is appropriate on Count III of the Amended Complaint.

### E. Violation of the Free Speech Clause

 Finally, the School argues the Mandate violates its free speech rights in three ways: (1) requesting an accommodation requires action which undermines the message it has sent regarding contraceptives through its previous conduct; (2) requesting an accommodation compels them to speak in a way that facilitates objectionable contraceptives; and (3) the accommodation compels the School to provide an avenue for coverage of counseling regarding contraceptives it finds objectionable. Freedom of speech "prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 61, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (citation omitted). Further, conduct may constitute speech if there is an intent to express a particular message and a great likelihood those viewing the conduct would understand the message. *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

 Here, the Court need not consider whether any conduct on its part constitutes speech because there is nothing about the Mandate which requires the School to act or speak in a manner contrary to its beliefs. The School is only required to object to the Mandate on reli-

gious grounds through the accommodation process. The School is free "to voice [its] disapproval of health-care products and services that they believe to be immoral." *Priests for Life*, 772 F.3d at 270. Moreover, the School voiced such objections to its insurance provider before the Mandate when setting up its health care coverage. As the Departments point out, the School can discourage its employees from using the contraceptive methods it feels are immoral. Further, the Free Speech challenges have also been widely rejected by the courts that have considered them. *See, e.g., id.* at 269–72. For these reasons, the School has not established a violation of the Establishment Clause and summary judgment in favor of the Departments is appropriate on Count IV of the Amended Complaint.

## III. Conclusion

Accordingly, Defendants' Motion for Summary Judgment, (Doc. 35), is **GRANTED.** Plaintiff's Motion for Summary Judgment, (Doc. 31), is **DENIED.** ACLU's Motion for Leave to File *Amici Curiae* Brief, (Doc. 38), is **DENIED.** This case is **DISMISSED in its entirety.**

**IT IS SO ORDERED.**