# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-1507

_____

Sharpe Holdings, Inc. a Missouri Corporation; Rita Joanne Wilson, a Missouri resident; Judi Diane Schaefer, a Missouri resident; Charles N. Sharpe, a Missouri resident; CNS Corporation, a Missouri Corporation; Ozark National Life Insurance Company, a Missouri Corporation; N.I.S. Financial Services, Inc. a Missouri Corporation; CNS International Ministries, A Missouri Non-Profit Corporation; Heartland Christian College, A Missouri Non-Profit Corporation

*Plaintiffs - Appellees*

v.

United States Department of Health and Human Services; Sylvia Mathews Burwell, in her official capacity as the Secretary of the United States Department of Health and Human Services; United States Department of the Treasury; United States Department of Labor; Jacob J. Lew, in his official capacity as the Secretary of the United States Department of the Treasury; Thomas E. Perez, in his official capacity as the Secretary of the United States Department of Labor[1]

*Defendants - Appellants*

------------------------------

American Civil Liberties Union; American Civil Liberties Union of Missouri; Julian Bond; National Women's Law Center; American Association of University Women; American Federation of State, County and Municipal Employees; Black Women's Health Imperative; Feminist Majority Foundation; Ibis Reproductive Health; Legal Momentum; MergerWatch; NARAL Pro-Choice America; NARAL Pro-Choice Minnesota; NARAL Pro-Choice Missouri; NARAL Pro-Choice South

---

[1]Secretary of Health and Human Services Sylvia Mathews Burwell is substituted for her predecessor, Kathleen Sebelius. See Fed. R. App. P. 43(c)(2).

Dakota; National Organization for Women Foundation; National Partnership for Women and Families; Planned Parenthood of the Heartland; Planned Parenthood of Kansas & Mid-Missouri; Planned Parenthood Minnesota, North Dakota, South Dakota; Planned Parenthood of the St. Louis Region and Southwest Missouri; Population Connection; Raising Women's Voices for the Health Care We Need; Service Employees' International Union; National Health Law Program; American Public Health Association; National Family Planning & Reproductive Health Association; National Women's Health Network; National Latina Institute for Reproductive Health; National Asian Pacific American Women's Forum; Asian Americans Advancing Justice; Asian Americans Advancing Justice - Los Angeles; Asian & Pacific Islander American Health Forum; Forward Together; Ipas; Sexuality Information and Education Council of the U.S.; HIV Law Project; 30 for 30 Campaign; California Women's Law Center

*Amici on Behalf of Appellant(s)*

Liberty, Life, and Law Foundation; Association of Gospel Rescue Missions; Prison Fellowship Ministries; Association of Christian Schools International; National Association of Evangelicals; Ethics and Religious Liberty Commission of the Southern Baptist Convention; American Bible Society; The Lutheran Church-Missouri Synod; Institutional Religious Freedom Alliance; Christian Legal Society

*Amici on Behalf of Appellee(s)*
_____

Appeal from United States District Court
for the Eastern District of Missouri - Hannibal
_____

Submitted: December 10, 2014
Filed: September 17, 2015
_____

Before WOLLMAN, COLLOTON, and BENTON, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Contending that the district court[2] abused its discretion, the Departments of Health and Human Services (HHS), Labor (DOL), and Treasury, as well as their respective Secretaries, (collectively, the government) appeal from the entry of a preliminary injunction enjoining the government from enforcing certain provisions of the Patient Protection and Affordable Care Act (ACA), 42 U.S.C. § 300gg-13, against CNS International Ministries, Inc. (CNS) and Heartland Christian College (HCC), each of which is a nonprofit religious organization that offers healthcare coverage to employees through a self-insured plan.[3] We affirm the order granting the preliminary injunction.

CNS, a Missouri nonprofit corporation with more than fifty employees, provides full-time residential services to men, women, and children with behavioral problems or who suffer from alcohol or drug dependencies, and it operates a school that serves the children of individuals in its recovery program, as well as its employees' children. HCC, also a Missouri nonprofit corporation but with fewer than fifty employees, provides post-secondary higher education to employees and residents of CNS and their dependents. Christian belief and practice are integral to the identities of both CNS and HCC, and they strive "to promote certain moral and ethical standards in their employees, including . . . a belief in the sanctity of life which precludes abortion on demand." As part of their religious mission to promote

---

[2]The Honorable David D. Noce, United States Magistrate Judge for the Eastern District of Missouri (hereinafter the district court), to whom the case was assigned by consent of the parties under 28 U.S.C. § 636(c).

[3]In separate orders that are not at issue in this appeal, the district court granted (1) a temporary restraining order for Appellants Sharpe Holdings, Inc.; Charles N. Sharpe; Rita Joanne Wilson; and Judi Diane Schaefer and (2) a preliminary injunction for Appellants CNS Corporation; Ozark National Life Insurance Company; and N.I.S. Financial Services, Inc.

-3-

the well-being and health of their employees, both CNS and HCC offer healthcare coverage to employees through self-insured group health plans, although HCC, with fewer than fifty employees, is not required by the ACA to offer healthcare coverage.

Under authority granted by the ACA, HHS promulgated regulations requiring "group health plan[s]" and "health insurance issuer[s] offering group or individual health insurance coverage" to cover, "[w]ith respect to women, . . . preventive care and screenings provided for in binding comprehensive health plan coverage guidelines supported by the Health Resources and Services Administration." 45 C.F.R. § 147.130(a)(1)(iv). At the recommendation of the Institute of Medicine, HHS adopted guidelines providing that nonexempt employers generally must provide "coverage, without cost sharing, for '[a]ll Food and Drug Administration [(FDA)] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity'" (the contraceptive mandate). 77 Fed. Reg. 8725, 8725 (Feb. 15, 2012); see 29 C.F.R. § 2590.715-2713(a).[4] Contraceptive methods approved by the FDA include intrauterine devices (IUDs), levonorgestrel (Plan B), and ulipristal acetate (ella), each of which "may have the effect of preventing an already fertilized egg from developing any further by inhibiting its attachment to the uterus." Burwell v. Hobby Lobby, 134 S. Ct. 2751, 2762-63 (2014). In general, any employer that offers employees a group health plan must comply with the contraceptive mandate or face penalties of $100 per day per affected "individual." 26 U.S.C. § 4980D(b). An employer with more than fifty employees that fails to provide employees with a group health plan is generally subject to penalties of $2,000 per year per full-time employee. Id. § 4980H(a), (c).

The ACA provides an exemption from the contraceptive mandate for "grandfathered" health plans, *i.e.*, those in existence at the time of the ACA's

_____

[4]Treasury and HHS regulations were similarly revised, but we cite only to DOL regulations unless otherwise indicated.

adoption. 42 U.S.C. § 18011; 29 C.F.R. § 2590.715-1251. The ACA also provides an exemption from the contraceptive mandate for group health plans sponsored by religious employers. 45 C.F.R. § 147.131(a) (HHS). The term "religious employer" is defined narrowly by reference to the Internal Revenue Code to include "churches, their integrated auxiliaries, and conventions or associations of churches," as well as "the exclusively religious activities of any religious order." Id. (citing the Internal Revenue Code, 26 U.S.C. § 6033(a)(3)(A)(i), (iii)). Under these exemptions, employers with grandfathered plans and religious employers may continue to offer their employees healthcare coverage that does not include contraceptives.

The regulations also provide an "accommodation" for certain religious organizations that have religious objections to the contraceptive mandate but do not qualify for the religious-employer exemption.[5] 78 Fed. Reg. 39,870, 39,871 (July 2, 2013); see also 29 C.F.R. § 2590.715-2713A. The accommodation is intended to protect religious organizations "from having to contract, arrange, pay, or refer for" contraceptive coverage. 78 Fed. Reg. at 39,872. It is available for a religious organization that (1) has religious objections to providing healthcare coverage for some or all contraceptive services, (2) "is organized and operates as a nonprofit entity," (3) "holds itself out as a religious organization," and (4) complies with a self-certification process. 29 C.F.R. § 2590.715-2713A(a). A self-insured[6] religious

---

[5]After the Supreme Court's decision in Hobby Lobby, the government revised the relevant regulations effective September 14, 2015, to extend this accommodation to certain closely held for-profit entities that have a religious objection to providing coverage for some or all of the FDA-approved contraceptive methods. See 80 Fed. Reg. 41,318 (July 14, 2015).

[6]A self-insured employer bears the financial risk of paying its employees' health-insurance claims rather than contracting with a separate insurance company to provide the coverage and bear the financial risk. A self-insured employer often hires a third-party administrator to manage administrative functions like processing claims. See, e.g., 1A Steven Plitt, et al., Couch on Insurance § 10:1 n.1 (3d ed. 2013).

organization, after "contract[ing] with one or more third party administrators," 29 C.F.R. § 2590.715-2713A(b)(1)(i), complies with the self-certification process in one of two ways.

The organization may self-certify by completing and submitting directly to its third-party administrator (TPA) an EBSA Form 700–Certification (Form 700), certifying that it is a religious nonprofit entity that has religious objections to providing coverage for some or all of the contraceptives required by the mandate. 29 C.F.R. § 2590.715-2713A(a)-(b). The organization may also self-certify by providing notice to HHS stating the organization's name; the basis on which it qualifies for an accommodation; its religious objections to providing coverage for some or all contraceptives, including the specific contraceptives to which it objects; its insurance plan name and type; and its TPA's name and contact information (HHS Notice).[7] See 79 Fed. Reg. 51,092, 51,094-95 (Aug. 27, 2014); 80 Fed. Reg. 41,318, 41,323 (July 14, 2015); 29 C.F.R. § 2590.715-2713A(b)(1)(ii)(B). The religious organization must

---

Because CNS and HCC offer self-insured plans, we focus our discussion on regulations applicable to those plans.

[7]This self-certification method was added to the regulations after the Supreme Court's order in Wheaton College v. Burwell, 134 S. Ct. 2806 (2014). Wheaton College, a religious organization, challenged the accommodation process, arguing that completing Form 700 and forwarding the Form to its insurance issuer made it complicit in the provision of contraceptive coverage in violation of its religious beliefs. The Supreme Court granted injunctive relief, enjoining the government from enforcing the contraceptive mandate while the college's challenge to the accommodation process was pending, provided that the college inform HHS "in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services." Id. at 2807. The college was not required to self-certify using Form 700. Id. The Court also stated, "Nothing in this order precludes the Government from relying on this notice, to the extent it considers it necessary, to facilitate the provision of full contraceptive coverage under the" ACA to Wheaton College's employees and students. Id.

also update its HHS Notice "[i]f there is a change in any of the information required to be included." 29 C.F.R. § 2590.715-2713A(b)(1)(ii)(B). According to the government, this information is "the minimum information necessary . . . to determine which entities are covered by the accommodation, to administer the accommodation, and to implement" government policy. 79 Fed. Reg. 51,092, 51,095 (Aug. 27, 2014); 80 Fed. Reg. 41,318, 41,323 (July 14, 2015). After HHS receives the Notice, it provides the information to DOL, which sends a separate notification to the religious organization's TPA. See id.

Once a TPA receives Form 700 from the religious organization or the separate notification from DOL "and agrees to enter into or remain in a contractual relationship with" the religious organization, the TPA must "provide or arrange payments for contraceptive services" for beneficiaries of the organization's group health plan either by providing those payments itself or by arranging for another party to do so. 29 C.F.R. § 2590.715-2713A(b)(2). The TPA is also "designat[ed] . . . plan administrator and claims administrator for contraceptive benefits" for the religious organization. 78 Fed. Reg. at 39,879. If a self-insured religious organization uses Form 700, the form becomes "an instrument under which the plan is operated [and is] treated as a designation of the [TPA] as the plan administrator under section 3(16) of ERISA[, 29 U.S.C. § 1002(33),] for any contraceptive services required to be covered." 29 C.F.R. § 2510.3-16(b). Form 700 authorizes the TPA to "provide or arrange payments for contraceptive services" and requires the TPA to provide separate notice regarding those services to participants and beneficiaries enrolled in the religious organization's group health plan. 29 C.F.R. § 2590.715-2713A(b)(2). If the self-insured religious organization instead self-certifies by HHS Notice, DOL's ensuing notification to the TPA also operates to "designate" the TPA "as plan administrator" under ERISA for contraceptive benefits. 79 Fed. Reg. at 51,095; see also 29 C.F.R. § 2510.3-16(b). Once the TPA receives Form 700 or notification from DOL, it also becomes eligible to be reimbursed for the full cost of contraceptive coverage, plus an additional allowance of "no less than 10 percent." 45 C.F.R.

-7-

§ 156.50 (HHS); 79 Fed. Reg. 13,744, 13,809 (Mar. 11, 2014) (noting that HHS specifies the amount of the yearly allowance and setting that amount at fifteen percent for 2015). The TPA must provide or arrange for separate payments for contraceptive coverage for a religious organization's plan beneficiaries "so long as [the beneficiaries] are enrolled in [the organization's] group health plan." 29 C.F.R. § 2590.715-2713A(d); see 45 C.F.R. § 147.131(c)(2)(i)(B) (HHS).[8]

CNS and HCC, in accordance with their sincerely held religious beliefs, oppose the use, funding, provision, or support of abortion on demand, and they believe that certain contraceptives required under the contraceptive mandate—Plan B, ella, and copper IUDs—are functionally equivalent to abortion on demand. As have a number of other religious organizations that do not qualify for the religious-employer exemption from the contraceptive mandate, CNS and HCC brought suit against the government, arguing that both the contraceptive mandate and the accommodation process impose a substantial burden on their exercise of religion in violation of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. §§ 2000bb to 2000bb-4, and the Free Exercise Clause of the First Amendment to the

_____

[8]It is not clear whether the ACA's implementing regulations impose a separate legal obligation on a TPA to provide contraceptive coverage to a religious organization's employees and plan beneficiaries or whether that obligation arises only after the TPA receives a copy of the organization's Form 700 or DOL notification and is thereby designated as a plan administrator for purposes of ERISA. See Priests for Life v. U.S. Dep't of Health & Human Servs., No. 13-5368, slip op. at 12 n.3 (D.C. Cir. May 20, 2015) (Brown, J., dissenting from denial of rehearing en banc); Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell, 794 F.3d 1151, 1208 (10th Cir. 2015) (Baldock, J., dissenting in part) (discussing effect of accommodation regulations in context of self-insured nonprofit religious organizations), petition for cert. filed, 84 U.S.L.W. 3056 (U.S. July 23, 2015) (No. 15-105); see also Wheaton College v. Burwell, 134 S. Ct. 2806, 2814 n.6 (2014) (Sotomayor, J., dissenting) (explaining that a TPA does not have an independent obligation to provide contraceptive coverage but "bears the legal obligation to provide contraceptive coverage only upon receipt of a valid self-certification").

U.S. Constitution. CNS and HCC contend that the government is coercing them to violate their religious beliefs by threatening to impose severe monetary penalties unless they either directly provide coverage for objectionable contraceptives through their group health plans or indirectly provide, trigger, and facilitate that objectionable coverage through the Form 700/HHS Notice accommodation process. They accordingly moved for a temporary restraining order and a preliminary injunction to enjoin enforcement of the contraceptive mandate and the accommodation regulations against them. The district court granted injunctive relief,[9] relying on an earlier order enjoining enforcement of "the ACA Mandate regulations regarding abortifacient devices and related counseling" against the for-profit plaintiffs, D. Ct. Order of Dec. 31, 2012, at 9, and reasoning that "the arguments for those plaintiffs are substantially similar to the arguments" raised by the nonprofit religious organizations, D. Ct. Order of Dec. 30, 2013, at 5.

After the notice of appeal was filed, the Supreme Court issued its order in Wheaton College v. Burwell, 134 S. Ct. 2806 (2014), and the government revised the accommodation regulations to permit religious organizations to self-certify using HHS Notice, as well as Form 700. We granted the parties' joint motion for permission to file supplemental briefs regarding the impact of the revised regulations on the issues presented in this appeal. CNS and HCC assert that the addition of HHS Notice as an alternative method to apply for accommodation does not alleviate the substantial burden imposed on their religious exercise, because it does "nothing more than coerce [them] into another avenue that violates their religion." They argue that they "must still submit a document that they believe wrongfully facilitates the delivery of such coverage."

---

[9]The district court did not specify whether its ruling was based on the RFRA or the Free Exercise claim. Because we conclude that CNS and HCC were entitled to relief based on their RFRA claim, we decline to address their Free Exercise claim.

The government asserts—as it did with respect to Form 700—that HHS Notice does not substantially burden CNS and HCC's exercise of religion, because the Notice does not facilitate the provision of contraceptive coverage by CNS and HCC's TPAs, which have a separate and independent legal obligation under the ACA to provide contraceptive coverage to CNS and HCC's employees. The government also argues that even if there were a substantial burden on the exercise of religion, it has employed the least restrictive means to accomplish its compelling interest in ensuring access to no-cost contraceptive coverage.

"A district court has broad discretion when ruling on [a] request[] for [a] preliminary injunction[], and we will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion." Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 803 (8th Cir. 2003) (quoting United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998)). In determining whether to grant injunctive relief, a district court generally considers "(1) the threat of irreparable harm to the movant; (2) the balance between the potential harm and any harm that granting the injunction will cause to other parties to the litigation; (3) the probability that the movant will succeed on the merits; and (4) the public interest." Id. (citations omitted); see also Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir.1981)). Although "no single factor is determinative," Dataphase, 640 F.2d at 113, the probability-of-success factor is the most significant, see Home Instead, Inc. v. Florance, 721 F.3d 494, 497 (8th Cir. 2013).

RFRA provides that a federal law may not "substantially burden a person's exercise of religion" unless the government "demonstrates that application of the burden to the person . . . is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."

42 U.S.C. § 2000bb-1.[10]  To state a claim under RFRA, a religious objector must show that the government substantially burdens a sincere religious exercise or belief. See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 428 (2006).  The burden then shifts to the government to show that it has a "compelling interest" in applying "the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." Id. at 429-30 (quoting 42 U.S.C. § 2000bb-1(b)).  To satisfy the compelling-interest requirement, the government must do more than identify "broadly formulated interests justifying the general applicability of government mandates." Id. at 431.  The government also bears the burden of showing that "application of the burden to the person . . . is the least restrictive means of furthering" its compelling interest. Id. at 424.  This burden-shifting approach applies even at the preliminary-injunction stage. Id. at 429-30.

Under RFRA, the government substantially burdens the exercise of religion when it "conditions receipt of an important benefit upon conduct proscribed by a religious faith" or "denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 717-18 (1981).  In other words, governmental action substantially burdens the exercise of religion when it coerces private individuals into violating their religious beliefs or penalizes them for those beliefs by denying them the "rights, benefits, and privileges enjoyed by other citizens." Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 449 (1988).

_____

[10]"RFRA expressly adopted the compelling interest test 'as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972).'" Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 431 (2006).

Here, the substantial burden imposed by the government on CNS and HCC's exercise of religion is the imposition of significant monetary penalties should CNS and HCC adhere to their religious beliefs and refuse to comply with the contraceptive mandate or the accommodation regulations. This burden mirrors the substantial burden recognized by the Supreme Court in Hobby Lobby. CNS and HCC face the same consequences for noncompliance as did the plaintiffs in Hobby Lobby. 134 S. Ct. at 2759, 2775-76. Like the plaintiffs in Hobby Lobby, if CNS and HCC fail to comply with the challenged regulations, they will be subject to substantial monetary penalties. See id. at 2775-76 (citing 26 U.S.C. §§ 4980D, 4980H). When the government imposes a direct monetary penalty to coerce conduct that violates religious belief, "[t]here has never been a question" that the government "imposes a substantial burden on the exercise of religion." Priests for Life v. U.S. Dep't of Health & Human Servs., No. 13-5368, slip op. at 6 n.3 (D.C. Cir. May 20, 2015) (Kavanaugh, J., dissenting from denial of rehearing en banc); see also Hobby Lobby, 134 S. Ct. at 2759 (imposing penalty for refusal to provide contraceptive coverage); Wisconsin v. Yoder, 406 U.S. 205, 208, 218 (1972) (imposing penalty for refusal to send children to high school); Sherbert v. Verner, 374 U.S. 398, 404 (1963) (equating denial of benefits with imposition of penalty for Saturday worship); Univ. of Notre Dame v. Burwell, 786 F.3d 606, 628 n.1 (7th Cir. 2015) (Flaum, J., dissenting) ("[O]nce we determine a religious belief is burdened, substantiality is measured by the severity of the penalties for non-compliance."). As noted by the Court in Hobby Lobby, "[i]f these consequences do not amount to a substantial burden, it is hard to see what would." 134 S. Ct. at 2759.

The "exercise of religion" protected under RFRA "involves not only belief and profession but the performance of (or abstention from) physical acts that are engaged in [or forborne] for religious reasons." Hobby Lobby, 134 S. Ct. at 2770 (internal quotation and citation omitted). "RFRA was designed to provide very broad protection for religious liberty," indeed, protection "far beyond what [the Supreme] Court has held is constitutionally required." Id. at 2767. Significantly, RFRA

-12-

protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" and "mandate[s] that this concept be construed in favor of a broad protection of religious exercise." Id. at 2762 (internal quotation and citation omitted).

CNS and HCC submit that their religious beliefs prohibit them from providing healthcare coverage for certain contraceptives. They further assert that the government's purported accommodation of their religious beliefs—the requirement that they submit Form 700 or HHS Notice so that their TPA can provide the objectionable contraceptives—is no accommodation at all because it, too, substantially burdens their exercise of religion. The government does not dispute the sincerity of CNS and HCC's religious beliefs. When sincerity is not in dispute, we must consider the religious belief or exercise at issue and determine whether the government has placed substantial pressure, *i.e.*, a substantial burden, on the religious objector to engage in conduct that violates the religious belief or to abstain from engaging in conduct that is required by that belief. See Hobby Lobby, 134 S. Ct. at 2775-76 (concluding that substantial burden arises when the government "demands" that a religious objector either "engage in conduct that seriously violates [his] religious beliefs" or suffer "substantial" "consequences"); Bowen v. Roy, 476 U.S. 693, 703 (1986) (suggesting that substantial burden may exist when the government compels a religious objector "by threat of sanctions, to refrain from religiously motivated conduct or to engage in conduct that [he] find[s] objectionable for religious reasons") (footnote omitted).

Our inquiry in this regard is necessarily constrained because "it is not within the judicial function" to determine whether a religious belief or practice comports with the tenets of a particular religion. Thomas, 450 U.S. at 716 ("Courts are not arbiters of scriptural interpretation."). Instead, we must accept a religious objector's description of his religious beliefs, regardless of whether we consider those beliefs "acceptable, logical, consistent, or comprehensible." Id. at 714. In other words, a religious objector is entitled to "dr[a]w a line" regarding the conduct that his religion

-13-

deems permissible, and once that line is drawn, "it is not for [a court] to say that the line . . . was . . . unreasonable." Id. at 715. "[O]ur 'narrow function . . . in this context,'" therefore, "'is to determine' whether the line drawn reflects 'an honest conviction.'" Hobby Lobby, 134 S. Ct. at 2779 (quoting Thomas, 450 U.S. at 716).

CNS and HCC assert that their religious beliefs dictate that they abstain from conduct that furthers the government's regulatory scheme to provide their employees and plan beneficiaries with coverage for objectionable contraceptives. They argue that the accommodation provided via the Form 700/HHS Notice procedure does not eliminate the substantial burden imposed on their religious beliefs because the accommodation process itself triggers the provision of objectionable coverage by their TPAs, making them complicit in conduct that violates their religious beliefs.

The government argues that the accommodation process cannot substantially burden CNS and HCC's exercise of religion because, as a matter of law, it does not trigger, facilitate, or make CNS and HCC complicit in the provision of that coverage. This is true, the government says, because the ACA already imposes an obligation on TPAs to provide contraceptive coverage to their employees and plan beneficiaries.

The government's argument has prevailed in several cases, in each of which the courts concluded as a matter of law that because the accommodation process does not trigger contraceptive coverage or make the religious objector complicit in the provision of that coverage, the accommodation process cannot impose a substantial burden on the exercise of religion.[11] See Catholic Health Care Sys. v. Burwell, No.

_____

[11]In reaching this conclusion, the courts have reasoned that "[i]t is federal law, rather than the religious organization's signing and mailing [Form 700 or HHS Notice], that requires health-care insurers, along with [TPAs] of self-insured health plans, to cover contraceptive services. By refusing to fill out the form [the religious objector] would subject itself to penalties, but [its insurer and TPA] would still be required to provide [contraceptive] services to" employees and plan beneficiaries.

-14-

14-427, 2015 WL 4665049, at *7 (2d Cir. Aug. 7, 2015) (noting that while the court will accept the sincerity of an objector's religious beliefs, "it must assess the nature of a claimed burden on religious exercise to determine whether, as an objective legal matter, that burden is 'substantial' under RFRA"); Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell, 794 F.3d 1151, 1176 (10th Cir. 2015) (noting that "courts—not plaintiffs—must determine if a law or policy substantially burdens religious exercise"), petition for cert. filed, 84 U.S.L.W. 3056 (U.S. July 23, 2015) (No. 15-105); E. Tex. Baptist Univ. v. Burwell, 793 F.3d 449, 457-59 (5th Cir. 2015) (citing Bowen, 476 U.S. 693, and Lyng, 485 U.S. 439, as binding authority to "decid[e], as a question of law, whether the challenged law pressures the objector to modify his religious exercise), petition for cert. filed, 84 U.S.L.W. 3050 (U.S. July

_____

Univ. of Notre Dame v. Burwell, 786 F.3d 606, 614 (7th Cir. 2015); see also Catholic Health Care Sys. v. Burwell, No. 14-427, 2015 WL 4665049, at *12-13 (2d Cir. Aug. 7, 2015); Little Sisters of the Poor, 794 F.3d 1151, 1180-81; E. Tex. Baptist Univ. v. Burwell, 793 F.3d 449, 458-62 (5th Cir. 2015), petition for cert. filed, 84 U.S.L.W. 3050 (U.S. July 8, 2015) (No. 15-35); Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs., 778 F.3d 422, 441-42 (3d Cir. 2015), petition for cert. filed sub nom. Zubik v. Burwell, 83 U.S.L.W. 3894 (U.S. May 29, 2015) (Nos. 14-1418, 14A1065), and petition for cert. filed, 84 U.S.L.W. 3096 (U.S. Aug. 11, 2015) (Nos. 15-191, 15A1); Priests for Life v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 256 (D.C. Cir. 2014) petition for cert. filed, 83 U.S.L.W. 3918 (U.S. June 9, 2015) (No. 14-1453), and petition for cert. filed sub nom. Roman Catholic Archbishop of Wash. v. Burwell, 83 U.S.L.W. 3936 (U.S. June 19, 2015) (No. 14-1505); Mich. Catholic Conference & Catholic Family Servs. v. Burwell, 755 F.3d 372, 387-88 (6th Cir. 2014), cert. granted and judgment vacated, 135 S. Ct. 1914 (2015) (vacating and remanding for further consideration in light of Hobby Lobby), and reissued and reaffirmed on remand, Nos. 13-2723, 13-6640, 2015 WL 4979692 (6th Cir. Aug. 21, 2015); but see Eternal Word Television Network, Inc. v. Sec'y, U.S. Dep't of Health & Human Servs., 756 F.3d 1339, 1347 (11th Cir. 2014) (Pryor, J., specially concurring in order granting injunction pending appeal) (disagreeing with conclusion of Sixth and Seventh Circuits that "mandate imposes an independent obligation on" TPAs that "does not constitute a substantial burden").

8, 2015) (No. 15-35); Univ. of Notre Dame, 786 F.3d at 612 ("Although Notre Dame is the final arbiter of its religious beliefs, it is for the courts to determine whether the law actually forces Notre Dame to act in a way that would violate those beliefs."); Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs., 778 F.3d 422, 435 (3d Cir. 2015) ("Without testing the appellees' religious beliefs, we must nonetheless objectively assess whether the appellees' compliance with the self-certification procedure does, in fact, trigger, facilitate, or make them complicit in the provision of contraceptive coverage."), petition for cert. filed sub nom. Zubik v. Burwell, 83 U.S.L.W. 3894 (U.S. May 29, 2015) (Nos. 14-1418, 14A1065), and petition for cert. filed, 84 U.S.L.W. 3096 (U.S. Aug. 11, 2015) (Nos. 15-191, 15A1); Priests for Life v. U.S. Dep't of Health & Human Servs., 772 F.3d 229, 247 (D.C. Cir. 2014) ("Accepting the sincerity of Plaintiffs' beliefs, however, does not relieve this Court of its responsibility to evaluate the substantiality of any burden on Plaintiffs' religious exercise . . . . Whether a law substantially burdens religious exercise under RFRA is a question of law for courts to decide, not a question of fact."), petition for cert. filed, 83 U.S.L.W. 3918 (U.S. June 9, 2015) (No. 14-1453), and petition for cert. filed sub nom. Roman Catholic Archbishop of Wash. v. Burwell, 83 U.S.L.W. 3936 (U.S. June 19, 2015) (No. 14-1505); Mich. Catholic Conference & Catholic Family Servs. v. Burwell, 755 F.3d 372, 385 (6th Cir. 2014) ("[A]lthough we acknowledge that the appellants believe that the regulatory framework makes them complicit in the provision of contraception, we will independently determine what the regulatory provisions require and whether they impose a substantial burden on appellants' exercise of religion."), cert. granted and judgment vacated, 135 S. Ct. 1914 (2015) (vacating and remanding for further consideration in light of Hobby Lobby) and reissued and reaffirmed on remand, Nos. 13-2723, 13-6640, 2015 WL 4979692 (6th Cir. Aug. 21, 2015); but cf. Eternal Word Television Network, Inc. v. Sec'y, U.S. Dep't of Health & Human Servs., 756 F.3d 1339, 1340 (11th Cir. 2014) (granting motion for injunction pending appeal against enforcement of contraceptive mandate in light of Hobby Lobby).

As Hobby Lobby instructs, however, we must accept CNS and HCC's assertion that self-certification under the accommodation process—using either Form 700 or HHS Notice—would violate their sincerely held religious beliefs. See Hobby Lobby, 134 S. Ct. at 2778; see also Hernandez v. Comm'r, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."). It is not our role to second-guess CNS and HCC's honest assessment of a "difficult and important question of religion and moral philosophy, namely, the circumstances under which it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of an immoral act by another." Hobby Lobby, 134 S. Ct. at 2778. As discussed above, Form 700 or HHS Notice will inform CNS and HCC's TPA of its obligations to facilitate contraceptive coverage for CNS and HCC's employees and plan beneficiaries and thus will play a part in providing the objectionable contraceptives. As in Hobby Lobby, CNS and HCC sincerely believe that the actions "demanded by the . . . regulations [are] connected to" illicit conduct "in a way that is sufficient to make it immoral for them to" take those actions. Id. CNS and HCC have drawn a line between actions they find "to be consistent with [their] religious beliefs" and actions they consider "morally objectionable." Id. (citing Thomas, 450 U.S. at 715). And it is not for us "'to say that the line [they] drew was an unreasonable one.'" Id. (quoting Thomas, 450 U.S. at 715); see also Priests for Life, slip op. at 12 (Kavanaugh, J., dissenting from denial of rehearing en banc) ("Judicially second-guessing the correctness or reasonableness (as opposed to the sincerity) of plaintiffs' religious beliefs is exactly what the Supreme Court in Hobby Lobby told us not to do.").

The government insists that because the ACA's requirement that insurance issuers and group health plans include contraceptive coverage is wholly independent of CNS and HCC's self-certification, their exercise of religion cannot be substantially burdened by the accommodation process. Even if the ACA requires that insurance issuers and group health plans include contraceptive coverage regardless of whether

-17-

CNS and HCC self-certify, it also compels CNS and HCC to act in a manner that they sincerely believe would make them complicit in a grave moral wrong as the price of avoiding a ruinous financial penalty. If one equates the self-certification process with, say, that of obtaining a parade permit, then indeed the burden might well be considered light. But if one sincerely believes that completing Form 700 or HHS Notice will result in conscience-violating consequences, what some might consider an otherwise neutral act is a burden too heavy to bear. "The Supreme Court has emphasized that judges in RFRA cases may question only the sincerity of a plaintiff's religious belief, not the correctness or reasonableness of that religious belief." Priests for Life, slip op. at 8 (Kavanaugh, J., dissenting from denial of rehearing en banc); see also Eternal Word, 756 F.3d at 1347 (Pryor, J., specially concurring in order granting injunction pending appeal) (noting that religious objector's "legal interpretation is beside the point" because "[w]hat matters is whether the [objector's] participation in the contraception scheme—however minimal—violates its religious beliefs"); Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell, Nos. 13-1540, 14-6026, 14-6028, 2015 WL 5166807, at *2 (10th Cir. Sept. 3, 2015) (Hartz, J., dissenting from denial of rehearing en banc) ("I am aware of no precedent holding that a person's free exercise was not substantially burdened when a significant penalty was imposed for refusing to do something prohibited by the person's sincere religious beliefs (however strange, or even silly, the court may consider those beliefs)."); Grace Schs. v. Burwell, Nos. 14-1430, 14-1431, 2015 WL 5167841, at *18 (7th Cir. Sept. 4, 2015) (Manion, J., dissenting). Religious beliefs need not be "acceptable, logical, consistent, or comprehensible to others" to deserve protection. Thomas, 450 U.S. at 714. The question here is not whether CNS and HCC have correctly interpreted the law, but whether they have a sincere religious belief that their participation in the accommodation process makes them morally and spiritually complicit in providing abortifacient coverage. Their affirmative answer to that question is not for us to dispute.

As it did in <u>Hobby Lobby</u>, the government argues here that CNS and HCC's objection to the contraceptive mandate is really an objection to the conduct of third parties and that "the connection between what [CNS and HCC] must do . . . and the end that they find to be morally wrong . . . is simply too attenuated." See <u>Hobby Lobby</u>, 134 S. Ct. at 2777. In <u>Hobby Lobby</u>, the third parties were the plaintiffs' employees who would use the contraceptive benefits provided in the group health plan. Here, the third parties are TPAs, who will provide the objectionable coverage to CNS and HCC's employees through the group health plan. The Supreme Court rejected this argument in <u>Hobby Lobby</u>, characterizing it as tantamount to "tell[ing] the [religious objectors] that their beliefs" about complicity in the provision of contraceptive coverage were "flawed," "mistaken[,] or insubstantial"—moral and philosophical judgments that are not for the courts to make. <u>Id.</u> at 2778-79. Instead, when a religious objector deems the required conduct to cross the line of morally and religiously acceptable behavior, "it is not for us to say that their religious beliefs are mistaken or insubstantial." <u>Id.</u> at 2779.

The government also argues that the self-certification process cannot substantially burden CNS and HCC's exercise of religion because they were already instructing their TPA not to provide contraceptive coverage and thus had already declared their religious objection to such devices and products. What this argument fails to appreciate, however, is that self-certification under the accommodation process accomplishes what CNS and HCC's prior instructions had specifically prevented: the provision of objectionable coverage through their group health plans. We need look no further than to the government's own litigation behavior to gauge the importance of self-certification in the regulatory scheme. If TPAs had a wholly independent obligation to provide contraceptive coverage to religious objectors' employees and plan beneficiaries, there would be no need to insist on CNS and HCC's compliance with the accommodation process.

-19-

In light of CNS and HCC's sincerely held religious beliefs, we conclude that compelling their participation in the accommodation process by threat of severe monetary penalty is a substantial burden on their exercise of religion. See Hobby Lobby, 134 S. Ct. at 2778 ("Arrogating the authority to provide a binding national answer to this religious and philosophical question, [the government] in effect tell[s] the plaintiffs that their beliefs are flawed. For good reason, we have repeatedly refused to take such a step."). That they themselves do not have to arrange or pay for objectionable contraceptive coverage is not determinative of whether the required or forbidden act is or is not religiously offensive. See id. at 2778; Thomas, 450 U.S. at 715. We thus conclude that CNS and HCC have shown a substantial likelihood of success on the merits of their claim that the contraceptive mandate and accommodation process impose a substantial burden on their religious beliefs.

The question remains whether the government has established a compelling interest which it has used the least restrictive means to further. As noted above, under RFRA, the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person . . . is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The government must "demonstrate that the compelling interest test is satisfied through application of the challenged law to . . . the particular claimant whose sincere exercise of religion is being substantially burdened." Hobby Lobby, 134 S. Ct. at 2779 (quoting O Centro, 546 U.S. at 430-31). "[B]roadly formulated," O Centro, 546 U.S. at 431, or "sweeping" governmental interests are inadequate, Yoder, 406 U.S. at 221. Rather, the government must show with "particularity how [even] admittedly strong interest[s] . . . would be adversely affected by granting an exemption" to a particular claimant. Id. at 236.

The government has asserted that its compelling interests in safeguarding public health and in ensuring that women have equal access to health care are furthered by the contraceptive mandate and the accommodation process. See 78 Fed.

Reg. at 39,872. In Hobby Lobby, Justice Alito, writing for the Court, "assume[d] that the interest in guaranteeing cost-free access to the four challenged contraceptive methods is compelling within the meaning of RFRA." 134 S. Ct. at 2780. As did the Supreme Court, we will entertain the same assumption and proceed to consider whether the government has shown that the contraceptive mandate and accommodation process are the least restrictive means of furthering the government's compelling interests. See Hobby Lobby, 134 S. Ct. at 2780.

Under the "exceptionally demanding" least-restrictive-means test, Hobby Lobby, 134 S. Ct. at 2780, "if there are other, reasonable ways to achieve those [interests] with a lesser burden on . . . protected activity, [the government] may not choose the way of greater interference," Dunn v. Blumstein, 405 U.S. 330, 343 (1972). Thus, a regulation may constitute the least restrictive means of furthering the government's compelling interests if "no alternative forms of regulation" would accomplish those interests without infringing on a claimant's religious-exercise rights. See Sherbert, 374 U.S. at 407.

We first reiterate that the government bears the burden of proof on this issue, which requires it to come forward with evidence that the contraceptive mandate and the accommodation process are the only feasible means to distribute cost-free contraceptives to women employed by religious organizations and that no alternative means would suffice to achieve its compelling interest. It must show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by" CNS and HCC. Hobby Lobby, 134 S. Ct. at 2780.

In Hobby Lobby, the Supreme Court determined that the accommodation process was "less restrictive than requiring employers to [directly] fund contraceptive methods that violate their religious beliefs." Id. at 2782. But the Court also emphasized that it was specifically "not decid[ing] . . . whether an approach of this type complies with RFRA for purposes of all religious claims." Id. It simply

-21-

suggested that the accommodation process would be an acceptable alternative for organizations that did not assert a religious objection to the accommodation process itself. See id. at 2782 & n.40 ("The less restrictive approach we describe accommodates the religious beliefs *asserted in these cases*, and that is the only question we are permitted to address." (emphasis added)); id. at 2786 (Kennedy, J., concurring) (noting that "the plaintiffs have not criticized [the accommodation process] with a specific objection that has been considered in detail").

Any suggestion that the Court in Hobby Lobby sanctioned the existing accommodation process for all purposes was dispelled only days later when the Court issued its order in Wheaton College and enjoined enforcement of the contraceptive mandate and the Form 700 accommodation regulations as long as Wheaton College directly notified HHS of its religious objection. 134 S. Ct. at 2807. The college was not required to self-certify by Form 700 to obtain an accommodation, and it was not required to provide the detailed information and updates demanded under the revised accommodation regulations establishing HHS Notice. See Wheaton College, 134 S. Ct. at 2807; see also Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Sebelius, 134 S. Ct. 1022 (2014) (enjoining government from enforcing contraceptive mandate if written notice is provided to HHS stating that objectors "are non-profit organizations that hold themselves out as religious and have religious objections to providing coverage for contraceptive services"). And on June 29, 2015, the Supreme Court granted injunctive relief for the third time in another case involving a nonprofit religious organization. Zubik v. Burwell, 135 S. Ct. 2924 (2015) (order enjoining enforcement of the "challenged provisions" of the ACA pending final disposition of their petition for certiorari, provided that Wheaton College notice is submitted to HHS). Thus, in Wheaton College, Little Sisters of the Poor, and Zubik, the Supreme Court approved a method of notice to HHS that is arguably less onerous than either Form 700 or HHS Notice yet permits the government to further its interests. Although the Court's orders were not final rulings on the merits, they at the very least collectively constitute a signal that less restrictive means exist by which the

-22-

government may further its interests. See Priests for Life, slip op. at 23 (Kavanaugh, J., dissenting from denial of rehearing en banc) ("[R]egardless of whether we as a lower court are *formally* bound by the Supreme Court stay orders in Wheaton College and Little Sisters of the Poor, the notice identified by the Supreme Court in those two cases is undoubtedly a less restrictive way for the Government to further its interest than [Form 700 or HHS Notice]."). If the employer's TPA is known to the government, then there should be no cost to allowing the less onerous notice. Even if the TPAs are not known, the government has not shown at this stage of the proceedings that the inconvenience of identifying the TPAs likely would create an administrative problem of sufficient magnitude to make the entire scheme unworkable. See Sherbert, 374 U.S. at 408-09; Bowen, 476 U.S. at 731 (O'Connor, J., concurring in part and dissenting in part).

In addition, notice similar to that sanctioned by the Supreme Court in Wheaton College and Zubik will not affect the ability of CNS and HCC's employees and plan beneficiaries to obtain contraceptive coverage or "preclude the Government from relying on th[e] notice, to the extent it considers it necessary, to facilitate the provision of full contraceptive coverage under the" ACA. Wheaton College, 134 S. Ct. at 2807; Zubik, 135 S. Ct. at 2924 (same). The impact a religious accommodation may have on third parties is an important factor, because it "will often inform the analysis of the Government's compelling interest and the availability of a less restrictive means of advancing that interest." Hobby Lobby, 134 S. Ct. at 2781 n.37; see also id. at 2760 (observing that "the effect of the . . . accommodation on the women employed by Hobby Lobby . . . would be precisely zero" because they "would still be entitled to all FDA-approved contraceptives without cost sharing").

CNS and HCC also suggest other less restrictive means that could accomplish the government's objectives and relieve the substantial burden on their exercise of religion. These include what the Court in Hobby Lobby characterized as "[t]he most straightforward way of doing this," namely, "for the Government to assume the cost

of providing the . . . contraceptives at issue to any women who are unable to obtain them under their health-insurance policies due to their employers' religious objections." 134 S. Ct. at 2780. "[C]ost may be an important factor in the least-restrictive means analysis, but both RFRA and its sister statute, RLUIPA, may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs." Id. at 2781. CNS and HCC urge that the government could provide subsidies, reimbursements, tax credits, or tax deductions to employees, or that the government could pay for the distribution of contraceptives at community health centers, public clinics, and hospitals with income-based support. On the minimal record thus far developed, the government has not shown that these alternatives are infeasible. See Korte v. Sebelius, 735 F.3d 654, 686-87 (7th Cir. 2013); Univ. of Notre Dame, 786 F.3d at 630 (Flaum, J., dissenting); E. Tex. Baptist Univ. v. Sebelius, 988 F. Supp. 2d 743, 770 (S.D. Tex. 2013), rev'd on other grounds, 793 F.3d 449.

CNS and HCC also propose that the government could make contraceptives available to employees through its own healthcare exchanges. Under this approach, the government "could treat employees whose employers do not provide complete coverage for religious reasons the same as it does employees whose employers provide no coverage at all." Priests for Life, slip op. at 17 (Brown, J., dissenting from denial of rehearing en banc). "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." Holt v. Hobbs, 135 S. Ct. 853, 864 (2015). As the government must prove that its proposed mandate is the only feasible and effective means of achieving the asserted compelling interests, we cannot say on this limited record that the government has eliminated the use of healthcare exchanges as a viable option.

Applying the substantial-burden test set forth in Hobby Lobby, we conclude that CNS and HCC have established that they are likely to succeed on the merits of their RFRA challenge to the contraceptive mandate and the accommodation

regulations—the most significant factor in determining whether a preliminary injunction should issue. See Home Instead, Inc., 721 F.3d at 497. They have also established that in the absence of an injunction they will be forced to violate their sincerely held religious beliefs by complying with either the contraceptive mandate or the accommodation process or to incur severe monetary penalties for refusing to comply. Keeping in mind the deference we owe the district court in reviewing a decision to grant injunctive relief, we conclude that it did not abuse its discretion in finding that CNS and HCC were substantially likely to succeed on the merits of their claim that the contraceptive mandate and the accommodation process substantially burden their exercise of religion in violation of RFRA and that the current accommodation process is not the least restrictive means of furthering the government's interests. We therefore affirm the district court's order granting injunctive relief.

_____